NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PRODUCTION MOLDED PLASTICS,
INC. and Detroit Plastic Molding
Co., Respondents.

No. 77–1178.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 15, 1979.

Decided Aug. 16, 1979.

Elliott Moore, Deputy Associate Gen. Counsel, John H. Ferguson, Christopher Katzenbach, N.L.R.B., Washington, D. C., for petitioner.

John A. Entenman, Ronald J. Santo, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for respondents.

Before EDWARDS, Chief Judge, and CELEBREZZE and ENGEL, Circuit Judges.

EDWARDS, Chief Judge.

The Board seeks enforcement of its orders based on findings that Respondents violated Sections 8(a)(1) and (5) of the National Labor Relations Act by discriminating against the union president and by refusing to bargain with the union prior to closing their plant in Alliance, Ohio, for 15 months. The Board's order is reported at 221 N.L.R.B. No. 104 (1977).

The company has plants at three locations (Detroit, Michigan; Wallaceburg, Ontario, Canada; and Alliance, Ohio)—all engaged in making molded plastic parts principally for automobile companies. The plant in Alliance had been making TV cabinets also and lost a substantial contract in 1974 for such products. In February of 1975, the Alliance plant cut back its work force to 15 employees and in March of 1975, learned that its supply of natural gas was threatened by curtailment. At that point the company laid off the remaining 15 employees and transferred the work which they had been doing to the Canadian plant.

Meantime, as these circumstances began to impinge on the employees, they had organized and had voted to join the International Chemical Workers Union at an election held October 16, 1974. The collective bargaining began in January of 1975 and the union presented its economic demands on March 20. Shortly thereafter, the gas problem appeared on the horizon (it later

turned out not to have any effect upon the plant in which the 15 employees were working). The company informed the union on March 28 of the plan to lay off all workers and transfer the work to Canada. The union then demanded bargaining over the decision and the effect of it and requested financial information. The company refused to bargain over the closing and never supplied any financial information. It proceeded to remove some of the plant machinery and to lay off all employees. The union filed the instant complaint.

The Administrative Law Judge who heard this complaint found on these facts that the company was under the duty to bargain about both the decision to close and the effects of closing. He also found that one Cora Kocher, who was the union president, had been subjected to unfair working conditions because of her union activity. He found that the layoff of the 15 employees was motivated by antiunion bias.

The Board, however, took a somewhat different point of view. It affirmed the ALJ's findings and remedial order as to union president Kocher. But it held that the layoff was an economic decision made in good faith. The Board then adopted all the balance of the ALJ's findings, including a bargaining order and back pay to the 15 laid off workers until bargaining had been completed by either contract or impasse. (As discussed below the Board's remedy did not include reopening the Alliance plant.)

■ There is certainly substantial evidence (albeit disputed) on the record taken as a whole to warrant our enforcement of the Board's findings and enforcement of its order as to union president Kocher.

■ The plant closing issue is considerably more complex. It appears clear to us that again there is substantial evidence on the whole record to support the ALJ's and the Board's findings that the company (although requested to do so) did not bargain over either the decision to close the plant or over the effects of the closing of the plant. Nor did it, as requested, furnish the union economic information concerning the reasons for the layoffs.

The Board, however, did not approve the ALJ's finding that the plant closing was based upon antiunion animus. On the contrary, the Board held that economic considerations were motivating factors in the Respondent company's decision to move the 15 jobs to its Canadian plant. As a consequence, the Board did not approve that portion of the ALJ's order requiring Respondent to transfer the jobs which it had moved to Canada back to the Alliance, Ohio plant and reinstate the 15 employees who had been laid off.

Nonetheless, the Board did affirm the back pay remedy recommended by the ALJ, holding that under the Supreme Court's decision in *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), such a remedy was within the powers of the Board where "the Company had refused to bargain about a matter which is a statutory subject of collective bargaining." *Fibreboard, supra* at 215, 85 S.Ct. at 405. In *Fibreboard* the actual remedy ordered was the stronger remedy of reinstatement with back pay and in that case, as here, the Board had found the company's motive to have been economic rather than antiunion bias.

We recognize that *Fibreboard* is not directly in point since there the question dealt with contracting out maintenance work instead of having it performed by an inplant maintenance force. Clearly no major commitment or curtailment of capital or abandonment of a business was involved in *Fibreboard*. But on the facts of our present case, no such major commitment was involved here either.

This case must fall somewhere between *Fibreboard* and *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

In *Fibreboard, supra* 379 U.S. at 213, 85 S.Ct. at 404, the Court said:

The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. The Company's decision to contract out the maintenance

work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business.

In *Darlington, supra* 380 U.S. at 270, 273–74, 85 S.Ct. at 999–1001, the Court said:

A proposition that a single businessman cannot choose to go out of business if he wants to would represent such a startling innovation that it should not be entertained without the clearest manifestation of legislative intent or unequivocal judicial precedent so construing the Labor Relations Act. We find neither.

\* \* \*

We hold here only that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice. (Footnote omitted.)

This case appears to us on its facts to be much closer to the *Fibreboard* case than to the *Darlington* case.[1] Respondents in this case are very decidedly still in business. In fact, they have neither sold nor abandoned, nor completely closed the "small plant" at Alliance, Ohio. The transfer of some machinery and 15 jobs to their Canadian plant did not involve any major commitment of capital to a new enterprise nor any withdrawal from a previous line of company endeavor. Indeed, the same work continued to be performed on the same machinery

in the Canadian plant, albeit by other employees. What apparently made the move economically desirable were the lower overhead charges at the Canadian plant. These facts seem to us to justify the Board's conclusion that collective bargaining in advance of the decision might have produced a union offer which could have affected the decision to transfer the jobs.

Certainly, to quote *Fibreboard,* "to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." *Fibreboard Corp. v. NLRB, supra* 379 U.S. at 213, 85 S.Ct. at 404.

Finally, we find further support for our position in the Supreme Court's recent opinion in *Ford Motor Co. v. NLRB,* —— U.S. ——, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), in which the Court emphasized the Board's broad discretion in determining the mandatory subjects of bargaining under § 8(d). The Supreme Court stated:

Because it is evident that Congress assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain and because the "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise," *Meat Cutters v. Jewel Tea,* 381 U.S. 676, 685–686, 85 S.Ct. 1596, 1600, 14 L.Ed.2d 640 (1965), its judgment as to what is a mandatory bargaining subject is entitled to considerable deference.

\* \* \*

In 1947, the Taft-Hartley Act amended the National Labor Relations Act to obligate unions as well as management to bargain; and § 8(d) explicitly defined the duty of both sides to bargain as the obli-

---

1. We find support for our analysis in the decisions of this court and in those of other circuits. *Weltronic Company v. NLRB,* 419 F.2d 1120 (6th Cir. 1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970) (a plant relocation was a mandatory subject of bargaining); *International Ladies' Garment Workers Union v. NLRB,* 150 U.S.App.D.C. 71, 463 F.2d 907, 916–17 (1972) (plant relocation held to be mandatory subject of bargaining as it did not

alter the scope of the enterprise); *Brockway Motor Trucks v. NLRB,* 582 F.2d 720, 732–41 (3rd Cir. 1978) (company required to bargain over closing of one of its plants); *NLRB v. Adams Dairy, Inc.,* 350 F.2d 108 (8th Cir. 1965), *cert. denied,* 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966) (no duty to bargain over decision to *terminate* part of its business operations, i. e., distribution of milk).

gation to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 61 Stat. 142, now codified at 29 U.S.C. § 158(d). The original House bill had contained a specific listing of the issues subject to mandatory bargaining, H.R. 3020, 80th Cong., 1st Sess., § 2(11) (1947); H.R.Rep.No.245, 80th Cong., 1st Sess., 22–23, 49 (1947), but this attempt to "straight jacket [ ]" and to "limit narrowly the subject matters appropriate for collective bargaining," H.R.Rep.No.245, *supra,* at 71 (minority report); see also 93 Cong.Rec. 3556–3557 (1947) (remarks of Rep. Klein); *id.,* at 3719 (remarks of Rep. Norton), was rejected in conference in favor of the more general language adopted by the Senate and now appearing in § 8(d). S.1126, 80th Cong., 1st Sess., § 8(d) (1947); see 93 Cong.Rec. 6444 (1947) (summary report of Sen. Taft); cf. H.R.Conf.Rep.No.510, 80th Cong. 1st Sess., 8, 34 (1947); U.S.Code Cong.Serv. 1947, p. 1135. It is thus evident that Congress made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain. This case, therefore, is one of those situations in which we should "recognize without hesitation the primary function and responsibility of the Board . . . ," *Labor Board v. Insurance Agents,* 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960), which is that "of applying the general provisions of the Act to the complexities of industrial life . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of the 'actualities of industrial relations'." *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963), quoting *NLRB v. United Steelworkers,* 357 U.S. 357, 362–363, 78 S.Ct. 1268, 1271, 2 L.Ed.2d 1383 (1958).

Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute. *NLRB v. Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978).

*Ford Motor Co. v. NLRB,* —— U.S. at —— – ——, 99 S.Ct. at 1848–49 (footnotes omitted).

For the reasons outlined above, we grant enforcement of the Board's order.