NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PLYMOUTH STAMPING DIVISION,
ELTEC CORPORATION,
Respondent.

No. 88–5469.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1989.

Decided March 27, 1989.

Aileen A. Armstrong, Dep. Asso. Gen. Counsel, William Stewart, William A. Baudler (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., Bernard Gottfried, Regional Director, N.L.R.B., Region 7, Patrick V. McNamara, Detroit, Mich., for petitioner.

William L. Hooth (argued), James B. Perry, Andrew T. Baran, Cox, Hooth & Curley, Troy, Mich., for respondent.

Before KENNEDY and JONES, Circuit Judges and SILER, Chief District Judge.[*]

KENNEDY, Circuit Judge.

The National Labor Relations Board (Board), seeks enforcement of its Decision and Order against respondent, the Plymouth Stamping Division of the Eltec Corporation, finding that respondent violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by failing to give Local 985, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW or Union) adequate notice and a meaningful opportunity to bargain over respondent's decision to transfer and subcontract its parts assembly operation. On appeal, respondent argues that its decision to transfer the parts assembly operation was not a mandatory subject of bargaining and, alternatively, that the company's efforts to discuss the matter with the union, both pre- and post-transfer, satisfied its obligation to bargain in good faith. We find the decision of the Board to be supported by substantial evidence and in accordance with law and therefore affirm the Board's decision in all respects.

Respondent manufactures and sells automotive parts and related products in Plymouth, Michigan. The Union is the exclusive collective-bargaining representative of respondent's production and maintenance employees. Sometime in 1977, respondent began to experience serious financial problems as a result of a downturn in the automotive industry as a whole. According to respondent, sales continued to deteriorate in its manufacturing operations to the point where respondent decided to investigate contracting out its assembly operations. Ultimately, respondent's management decided to subcontract its parts as-

---

[*] The Honorable Eugene E. Siler, Jr., Chief United States District Judge for the Eastern District of Kentucky and United States District Judge for the Western District of Kentucky, sitting by designation.

sembly work to another company to be located in Wauseon, Ohio.

On February 11, 1980, respondent notified the Union's bargaining committee of its plans to subcontract. This notification came in the form of a letter advising: (1) that respondant would terminate its parts assembly operation at the conclusion of the second shift on Friday, February 15, 1980; (2) that assembly operation employees would either be transferred or laid off; and (3) that the action was necessary "due to economic and business reasons." The Union thereafter requested a meeting which was held on February 14, 1980.

During the February 14 meeting, respondent informed the Union that plant-wide layoffs would occur based on seniority. Respondent's Vice–President and General Manager Richard Taylor explained that respondent's economic decline resulted from a number of factors including declining sales, noncompetitive wage rates for parts assembly, overly burdensome Michigan taxes and high workmen's compensation costs. According to the testimony of several bargaining committee members, in response to a question concerning possible action to retain the assembly jobs, respondent stated that the Union would have to accept substantial wage cuts, a cost of living freeze, a reduction in some benefits and work rule modification. The Union requested that respondent delay any action until the Union's President returned from vacation the following week. Respondent stated that its decision was not final; however, for economic reasons it requested a reply from the Union by the next day (Friday, February 15) as to whether or not the Union would consider granting concessions.[1]

The Union failed to respond to respondent's request on Friday. Over the weekend of February 16 and 17, respondent moved its parts assembly equipment to Ohio at a cost of approximately $13,000.00. Unbeknownst to respondent, the Union, in

a letter dated February 14, had requested information regarding the specifics of respondent's decision. Respondent received the letter on February 20.

On March 11, respondent replied to the Union's letter of February 14 stating that respondent's plans, although continuing, were not "finalized" in the sense of being irreversible and that it was prepared to discuss the matter with the Union. Respondent, in addition to reiterating its other reasons for the decision to subcontract, further stated that it had terminated assembly operations because "assembly operations are labor intensive and the costs (wages/benefits) associated with supporting this labor group have made the company non-competitive."

On March 1, respondent entered into a formal agreement leasing its assembly equipment to the Ohio company. Respondent retained a right to terminate the lease and repossess the equipment. Respondent also retained its customers' purchase orders in order to maintain quality control. Pursuant to an option in the lease agreement, the Ohio company purchased the equipment from respondent on July 1 for $132,430.00.

A three member panel of the Board, with one member dissenting, found that respondent had violated the Act. Applying Board precedent, the panel found respondent's decision to transfer its parts assembly operation to be a subject of mandatory bargaining because the decision "turned upon labor costs ... and not ... upon a fundamental change in the nature of the Respondent's business." The panel further found no merit to respondent's argument that its offers to bargain either pre- or post-transfer in fact offered the Union a reasonable opportunity to bargain. The Board now seeks enforcement.

Collective bargaining is an essential "method of defusing and channeling conflict between labor and management" in an effort to maintain industrial peace and preserve interstate commerce. *First Nat'l*

---

1. The Board maintains that respondent's February 14 request was an ultimatum requiring final agreement to substantial wage and benefit reductions on 24 hours notice. Given our conclusion below, however, we accept respondent's

contention that it sought only an indication of the Union's willingness to consider respondent's request for concessions and not a binding commitment.

*Maintenance Corp. v. NLRB,* 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318 (1981). To this end, Congress has vested power in the Board to declare certain actions by unions and employers unfair including a failure "to bargain collectively." *See* 29 U.S.C. §§ 153 & 158 (1982). Despite the importance of give and take between management and labor on many issues, Congress has required mandatory bargaining on matters concerning only " 'wages, hours, and other terms and conditions of employment.' " *First Nat'l,* 452 U.S. at 674, 101 S.Ct. at 2578 (quoting 29 U.S.C. § 158(d)). A refusal to bargain over a proper subject of mandatory bargaining violates the Congressionally created duty and may be remedied by Board order. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

Congress deliberately used the somewhat vague phrase "conditions of employment" in defining mandatory bargaining subject matter to allow the Board substantial latitude to define the scope of mandatory bargaining in light of industrial realities and practices. *First Nat'l,* 452 U.S. at 675, 101 S.Ct. at 2579. Because Congress vested the Board with primary responsibility for determining whether bargaining subjects are "terms and conditions of employment," the Board's decision as to exactly which disputes are mandatory bargaining subjects is entitled to "considerable deference." *NLRB v. Production Molded Plastics, Inc.,* 604 F.2d 451, 453 (6th Cir.1979) (quoting *Ford Motor Co. v. NLRB,* 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed. 2d 420 (1979)). Despite the breadth of the phrase "conditions of employment," Congress did not intend to mandate bargaining over every conceivable issue arising between management and labor. "The National Labor Relations Act does not say that the employer and employees are bound to confer upon any subject which interests either of them; the specification of wages, hours, and other terms and conditions of employment defines a limited category of issues subject to compulsory bargaining." *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 220, 85 S.Ct. 398, 407, 13 L.Ed.2d 233 (1964) (Stewart J., concurring). Certain subjects, "such as choice of adver-

tising and promotion, product type and design, and financing arrangements," affect the conditions of employment only indirectly and are not decisions which management must discuss with labor. *See First Nat'l,* 452 U.S. at 676–77, 101 S.Ct. at 2579–80. On the other hand, certain decisions, "such as the order of succession of layoffs and recalls, production quotas, and work rules," are at the core of the employer-employee relationship properly subject to mandatory bargaining. *Id.* at 677, 101 S.Ct. at 2580.

■ An area of uncertainty exists, however, between those issues which may be classified as clearly either managerial decisions or conditions of employment. A guideline to follow in this grey area is "whether requiring bargaining over this sort of decision will advance the neutral purposes of the Act," *First Nat'l,* 452 U.S. at 681, 101 S.Ct. at 2582, namely promotion of labor-management relations and the collective-bargaining process without unduly burdening management's right freely to choose the "basic direction of a corporate enterprise." *Fibreboard,* 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring). Thus, while every decision affecting job security is not a subject of compulsory collective bargaining, neither is every decision motivated by a concern for economic profitability beyond the scope of the duty to bargain.

The Supreme Court has articulated a standard for determining whether a decision is the subject of mandatory bargaining. The Court has stated that "in view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *First Nat'l,* 452 U.S. at 679, 101 S.Ct. at 2581. Of particular importance is "[t]he appropriateness of the collective bargaining process for resolving [the issue in question]," *Fibreboard,* 379 U.S. at 214, 85 S.Ct. at 404, and the extent to which collective discussions between the parties might have resulted in a change in the employer's decision. *See NLRB v. Westinghouse Broad-*

*cast and Cable, Inc.*, 849 F.2d 15, 23 (1st Cir.1988) (bargaining with the union could have affected employer's decision to eliminate bargaining unit).

The process of balancing labor's understandable concern with any decision which may affect job security and management's concern with maintaining entrepreneurial control and flexibility of decision-making necessarily requires that the decision whether mandatory bargaining should take place turns upon the particular set of facts presented in the individual case. *See, e.g., NLRB v. Acme Indus. Prods, Inc.*, 439 F.2d 40, 42 (6th Cir.1971). The Supreme Court has found several facts significant in determining the propriety of collective negotiation concerning the decision to subcontract work. These facts are: (1) whether the decision has altered the company's "basic operation;" (2) whether the decision contemplated substantial capital investment; and (3) whether imposing a bargaining requirement would "significantly abridge" the employer's "freedom to manage the business." *Fibreboard*, 379 U.S. at 213, 85 S.Ct. at 404. An essential fact is whether labor problems contributed to the employer's decision to subcontract— such a connection indicates "that collective bargaining in advance of the decision might have produced a union offer which could have affected the decision to transfer the jobs." *Production Molded Plastics*, 604 F.2d at 453.

Applying the above standard to the facts of this case, we believe substantial evidence supports the Board's conclusion that respondent's decision to subcontract its parts assembly work was properly a subject of mandatory bargaining. First, respondent's transfer of the parts assembly work did not significantly alter the nature of respondent's business. Until the leased machinery was sold to the Ohio company on July 1, respondent could terminate the lease, return the machinery, and recall the workers; in fact, respondent indicated its willingness to do so. Moreover, as the Board observed, respondent retained the purchase orders for the parts work in order to continue monitoring quality control and retain customers. Second, respondent incurred no significant capital expenditures

until the parts assembly machines were sold to the Ohio company for $134,000.00. Although respondent incurred $13,000.00 in moving expenses, this Circuit has previously held that "[t]he transfer of some machinery and 15 jobs" did not represent a major commitment of capital sufficient to implicate the transferring employer's overall business scope or direction. *See Production Molded Plastics*, 604 F.2d at 453. As in *Production Molded Plastics* respondent's decision to subcontract the parts assembly work did not commit respondent to a new enterprise nor signify any permanent withdrawal from a previous line of business at least until the sale of the equipment on July 1.

Third, and from our perspective most significant, is the proof that problems concerning the "conditions of employment" were motivating factors behind respondent's decision to subcontract the parts assembly work. Respondent's disclosure of the transfer occurred shortly after an unsuccessful attempt to negotiate economic concessions from the Union in August and September of 1979. Respondent stated at the February 14 meeting with the Union that it would not subcontract the parts assembly work if the Union would agree to certain concessions. Even after the move, respondent, through outside counsel, repeatedly stated its willingness to move the equipment back from Ohio. Finally, Vice–President and General Manager Taylor testified that if the Union had been willing to negotiate concessions the parts assembly operation would not have been moved. Thus, respondent's decision to subcontract the parts assembly operation was motivated by a dispute concerning conditions of employment and respondent's actions can be characterized as "a unilateral act frustrating negotiation on the underlying questions of [the requested economic concessions], and so an evasion of its duty to bargain on these questions, which are concededly subject to compulsory collective bargaining." *Fibreboard*, 379 U.S. at 225, 85 S.Ct. at 410 (Stewart, J., concurring). *See also Otis Elevator Co.*, 269 N.L.R.B. 891, 892 (1984) (critical factor in determining whether a management decision is subject to mandatory bargaining is "the es-

sence of the decision itself, i.e., whether it turns upon a change in the nature or direction of the business, or turns upon labor cost") (plurality opinion).[2]

 Respondent maintains that even if the decision to move the parts assembly operation to Ohio was a subject of mandatory bargaining, respondent nevertheless offered the Union a full opportunity to bargain both before and after the February 16 move. The Board's finding that it did not is supported by substantial evidence. Even assuming that respondent's proposal of February 14 simply sought an indication of the Union's willingness to discuss economic concessions, this 24–hour ultimatum placed the Union in an untenable position. Its President and principal bargaining representative was out of town and the Union had insufficient information concerning the actual need for such concessions. Respondent contends that the Union had at least five business days from the time it first learned of the proposed move in which to negotiate with respondent. This argument, however, ignores the fact that the February 11 notice took the Union by surprise and the first date at which a meeting could be held with respondent's attorney present was three days later on February 14. The Board was justified in concluding that respondent hadn't seriously intended to bargain before moving, when it waited until February 11 to announce its plans to move, plans it began to formulate in December and January. The Board was entitled to find a notice of five business days was insufficient time to allow a meaningful exchange under all the circumstances here. *Cf. NLRB v. Borg Warner Corp.*, 663 F.2d 666, 668 (6th Cir.1981), *cert. denied* 457 U.S. 1105, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982) (two days notice insufficient).

We agree that the Board could find that respondent's offers to bargain *after* the February 16 move similarly did not satisfy its obligation to bargain. "The Union must be given a chance to discuss the specifics of any proposal before it is implemented." *Peerless Roofing Co. v. NLRB*, 641 F.2d 734, 735 (9th Cir.1981). If employers could, as a matter of law, satisfy their duty to bargain through post-implementation offers, then they could unilaterally cut wages and bargain afterwards with promises to restore wages at some future point in time. This power would subvert the bargaining process *ab initio*.

For the foregoing reasons, we grant enforcement of the Board's order.

---

**2.** Respondent argues that it was relieved of any duty to bargain because the Union failed to respond quickly to respondent's demands for concessions and because little hope existed for an agreement given the Union's previous refusal to consider economic concessions in the preceding months. Respondent's duty to bargain on this issue is not negated by the possibility or even the substantial probability that the Union would not agree to respondent's proposed economic concessions. The purpose of the duty to bargain is to give the collective bargaining process a chance to operate regardless of the possi-

bility of success. To hold otherwise would allow employers and unions to skip the bargaining stage altogether based upon their own perceptions regarding the low probability of reaching an agreement. Only upon receiving a definitive rejection or bargaining to impasse may the employer abandon the bargaining process and unilaterally implement its decision. The Union, of course, retains its right to strike in this situation. *See First Nat'l*, 452 U.S. at 675, 101 S.Ct. at 2579 (citing *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952)).