**PORTA–KING BUILDING SYSTEMS, DIVISION OF JAY HENGES ENTERPRISES, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross Petitioner.**

Nos. 93–2179, 93–2398.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1993.

Decided Jan. 21, 1994.

Ralph Edwards, St. Louis, MO, argued, for petitioner.

Margaret E. Luke, Washington, DC, argued, for respondent.

Before McMILLIAN, FAGG and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Porta–King Building Systems, Division of Jay Henges Enterprises, Inc. (Porta–King), petitions this court for review of a decision[1] of the National Labor Relations Board (Board) finding that Porta–King violated § 8(a)(1), (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (NLRA), by failing to notify and bargain with the Carpet, Linoleum, Hardwood and Resilient Tile Layers Local Union 1310 (Union) prior to laying off five employees for economic reasons. The Board has filed a cross-petition for enforcement of its order. The Board directed Porta–King to cease and desist, to post compliance notices and to offer to reinstate illegally laid off employees with full benefits and seniority. For reversal, Porta–King argues that the Administrative Law Judge's (ALJ) findings are not supported by substantial evidence in the record as a whole. For the reasons discussed below, we deny the petition for review and enforce the order of the Board.

---

1. *Porta–King Bldg. Sys.*, 310 N.L.R.B. No. 81 (Feb. 26, 1993).

## I. BACKGROUND

Porta–King manufactures and sells portable buildings such as toll booths and guardhouses and related products. Until October 1990, Porta–King operated a manufacturing facility in Earth City, Missouri. At that time, Porta–King relocated its manufacturing facility to Montgomery City, approximately sixty miles from Earth City. For more than twenty years, Porta–King and the Union were parties to a successive collective bargaining agreement at the Earth City facility. The last agreement was effective from May 1 until Porta–King closed its Earth City facility and relocated to Montgomery City in October 1990.

When Porta–King opened its Montgomery City facility, it did not recognize the Union. Most of the employees at the Montgomery City facility had not worked at the old Earth City facility. At the outset, Porta–King set the terms and conditions of employment for employees at the Montgomery City facility. Porta–King paid the Montgomery City employees lower wages than it had paid at Earth City and also provided fewer benefits and holidays. There were also different attendance and health insurance policies.

The Union filed a petition with the NLRB seeking to represent Porta–King's employees at the Montgomery City facility. After an election, the Union was certified as the exclusive collective bargaining representative of Porta–King's industrial and maintenance workers at the Montgomery City facility. At no time since Porta–King commenced operations at its Montgomery City facility have employees previously employed at the old Earth City facility constituted more than twenty-five percent of the bargaining unit workforce at the Montgomery City facility.

On April 12, 1991, the parties began bargaining for an initial collective bargaining agreement. On June 4, 1991, Porta–King and the Union held a negotiating session where Porta–King presented a contract proposal to the Union. The proposal differed greatly from the agreement that had existed between the parties at the Earth City facility. The proposal did not contain a union security clause, did contain drug testing provisions, and limited union representatives' access to the facility. Also, wages were lower at Montgomery City than at Earth City.

During a telephone conversation on May 29, 1991, Union business representative Eddie Johns mentioned to Steve Shulte, President of Porta–King, that he had heard rumors of a layoff at the Montgomery City facility. Shulte stated only that there had been a downturn in business. On June 25, 1991, five employees, including Charles David Orick, Jerry Fischer, Wilbur Hartsell, Paul Henke, and Chris Leonard, received layoff notices. The parties stipulated that the layoffs were made for economic reasons and that Porta–King did not notify or bargain with the Union prior to the layoffs. These were the first economic layoffs of bargaining unit employees at the Montgomery City facility. On June 26, 1991, Orick informed Johns that he had been laid off. The parties dispute whether or not Johns was also informed either by Orick or by Shulte of the other layoffs at that time.

In July 1991, Porta–King and the Union held a negotiating session where, among many other subjects, Orick's layoff was discussed. On August 7, 1991, the Union filed an unfair labor practice charge alleging that Orick had been unlawfully laid off and that "on information and belief other employees had been laid off in a similar fashion." On August 14, 1991, the Union sent a letter to Porta–King requesting information regarding the employment status of all bargaining unit employees. On August 29, 1991, Shulte sent a letter to the Union stating that, although he intended to contest the unfair labor practice charges, he was willing to meet and discuss the layoffs and any other subjects. The Union did not respond to Shulte's offer to discuss the layoffs. On September 11, 1991, Porta–King furnished the Union with the information relating to layoffs that the Union had requested in its August 14 letter. Upon receiving this information, the Union amended its charge to name the four other employees laid off on June 25.

The Regional Director issued a complaint against Porta–King contending that Porta–King violated § 8(a)(1), (5) of the NLRA by failing to notify and bargain with the Union

prior to laying off the five employees. The ALJ held a hearing and found that Porta–King's layoffs involved a unilateral change of working conditions without notice to or bargaining with the Union, and, consequently, that Porta–King had violated the NLRA. The Board affirmed the ALJ's determination and adopted his recommended order. As a remedy, the Board ordered Porta–King to cease and desist from the unfair labor practice found, offer reinstatement to the five employees and make them whole for any losses suffered. Porta–King filed a petition for review; the NLRB filed a cross-application for enforcement of its order.

## II. DISCUSSION

■ This court must enforce an order of the Board if the Board has correctly applied the law and its findings rest upon substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) (*Universal Camera*). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *GSX Corp. v. NLRB*, 918 F.2d 1351, 1356 (8th Cir.1990). A court reviewing the Board's factual findings "may not 'displace the Board's choice between two conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo' ". *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962) (quoting *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464). Thus, great deference is afforded to the Board's affirmation of the ALJ's findings. *NLRB v. American Postal Workers Union*, 618 F.2d 1249, 1254 (8th Cir.1980).

■ An employer violates § 8(a)(5) of the NLRA when it institutes a material change in the terms and conditions of employment in an area that is a compulsory subject of collective bargaining without giving the bargaining representative both reasonable notice and an opportunity to negotiate about the proposed change. *NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). Layoffs are a compulsory subject of bargaining and therefore a unilateral layoff by Porta–King violates

§ 8(a)(5). *NLRB v. Frontier Homes Corp.*, 371 F.2d 974, 979–80 (8th Cir.1967); *see also Local 512, Warehouse & Office Workers v. NLRB*, 795 F.2d 705, 711 (9th Cir.1986).

■ Section 8(a)(1) of the NLRA provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Among the § 7 rights guaranteed to employees is the right to engage in collective bargaining through representatives of their own choosing. Thus, Porta–King's refusal to bargain with the Union over employee layoffs in violation of § 8(a)(5) derivatively violated § 8(a)(1) by interfering with the collective bargaining rights of the employees. *See Metromedia, Inc. (KMBC–TV) v. NLRB*, 586 F.2d 1182, 1188 (8th Cir.1978).

Porta–King asserts two defenses. First, Porta–King contends that the layoffs were consistent with Porta–King's past practice and thus cannot constitute a unilateral change. Second, Porta–King argues that, assuming a duty to bargain over the layoffs existed, the Union waived its right to bargain over the layoffs because it failed to request that Porta–King bargain after being informed of the layoffs. Neither defense is meritorious.

■ First, Porta–King argues that it had a twenty-year history with the Union of instituting unilateral, economic layoffs, such layoffs occurred on the average of once a year, and the Union never protested or questioned the layoffs until the present case. Porta–King thus argues that it was under no obligation to bargain with the Union over the June 25, 1991 layoffs because these layoffs were conducted pursuant to a long-established, past practice whereby Porta–King laid off employees without notice to or bargaining with the Union. We disagree.

Porta–King attempts to rely solely on its past practice of instituting unilateral layoffs at the Earth City facility to justify the June 25, 1991 layoffs at the Montgomery City facility. Yet, the Montgomery City facility did not become unionized until April 1991 after a certified election was held. The Montgomery City facility was a newly certi-

fied bargaining unit, separate from the Earth City facility, and primarily composed of different employees. As the parties stipulated, at least seventy-five percent of the employees at the new Montgomery City facility never worked at the Earth City facility. Additionally, the Montgomery City facility included maintenance and industrial employees, whereas the Earth City facility included only industrial employees. As the ALJ observed, "[w]hat the Union did at some other plant at another time as a representative of [different] employees in an altogether different unit obviously cannot be binding on this new unit and the labor organization these employees have chosen to represent them."

The Board decisions upon which Porta–King relies are inapposite. The cases cited each involved past practices between an employer and a union located in the same bargaining unit at the same facility as the challenged practice. See Aquaslide 'N' Dive Corp., 281 N.L.R.B. 219, 223–24 (1986); Montgomery Ward & Co., 217 N.L.R.B. 165, 167 (1975). Here, different facilities, employee workforces and bargaining units were involved.

Moreover, Porta–King's conduct in unilaterally setting new terms and conditions of employment at the Montgomery City facility, including inferior wages, health insurance and attendance policies, and fewer holidays and benefits, belies any claim that a continuing union relationship existed between the Earth City and Montgomery City facilities. Porta–King expressly refused to apply the terms and conditions of the collective bargaining agreement at the Earth City facility to the Montgomery City facility and made clear its intent to sever any connection between the two facilities. As the ALJ observed, Porta–King "wiped the slate clean when it moved to Montgomery." Yet, Porta–King would like to adopt one condition of employment from the Earth City facility that operates to its advantage, namely, unilateral layoffs. We hold that the past practice of instituting unilateral, economic layoffs which existed between Porta–King and the Union at the Earth City facility was extinguished by the new collective bargaining relationship between the parties at the Montgomery City facility.

Second, Porta–King argues that, even if a notification and bargaining obligation existed on its part, the Union failed to act after being informed of the layoffs and thus waived any right to bargain over the issue. Porta–King claims that union business representative Johns was informed of the layoffs on June 26, 1991, one day after they occurred, by Porta–King president Shulte. Porta–King argues that the Union should have responded with a request to bargain over the layoffs. Both Johns and Shulte testified before the ALJ, and the ALJ credited Johns' denial of having any such conversation with Shulte. The credibility to be afforded to the testimony of Johns and Shulte is "within the sound discretion of the trier of facts, and should be reversed only in extraordinary circumstances." NLRB v. Oil, Chemical & Atomic Workers, 619 F.2d 708, 715 (8th Cir.1980). The clarity of Johns' testimony is evident from our review of the transcript, and extraordinary circumstances do not exist in the present case to justify a reversal of the ALJ's findings. "We will not overturn findings based upon credibility determinations unless they shock our conscience." United Exposition Service Co. v. NLRB, 945 F.2d 1057, 1059 (8th Cir.1991) (quoting NLRB v. Iowa Beef Processors, Inc., 675 F.2d 1004, 1006 (8th Cir.1982)). We hold that there is substantial evidence to support the finding that Johns was not told of the layoffs by Shulte on June 26, 1991.

Porta–King also relies upon a conversation between Johns and employee Orick on June 26, 1991, and argues that in that conversation Orick informed Johns of the employee layoffs. The ALJ found that Johns credibly testified that Orick only told him that he, Orick, had been laid off, no other employees were discussed, and Johns had only heard rumors of other employee layoffs. The ALJ credited Johns' testimony that he did not in fact learn who or how many others were laid off until August 1991, six weeks after the layoffs occurred. "[M]ere suspicion or conjecture cannot take the place of notice where notice is required," and will not be sufficient to support a finding

of waiver. *Local 512, Warehouse & Office Workers v. NLRB,* 795 F.2d 705, 711 (9th Cir.1986) (quoting *ILGWU v. NLRB,* 463 F.2d 907, 918 (D.C.Cir.1972)). Plant gossip and rumors of employee layoffs also fail as substitutes for formal notice. *NLRB v. Rapid Bindery, Inc.,* 293 F.2d 170, 176 (2d Cir. 1961). We hold that the Union's failure to act upon rumors and speculation of employee layoffs is not comparable to a deliberate waiver of its right to bargain.

Porta–King further contends that the Union waived its right to bargain over the layoffs because, in July 1991, Porta–King and the Union met to negotiate a collective bargaining agreement and during that meeting reviewed Porta–King's proposal of June 5, 1991; which contained a management rights provision that would grant Porta–King the right to unilaterally lay off employees for economic reasons. Porta–King argues that the Union's knowledge of the layoffs coupled with their failure to object to the layoffs during negotiations over Porta–King's contract proposal amounted to a waiver of any right to bargain over the layoffs. Porta–King relies upon *American Diamond Tool, Inc.,* 306 N.L.R.B. No. 108 (1992) (*American Diamond*), to support its contention. In *American Diamond,* the Board held that a union may be found to have waived its right to bargain over economic layoffs by failing to request bargaining after learning of the layoffs. In *American Diamond,* the Board relied upon several factors to conclude that the union waived its right to bargain over economic layoffs. The Board observed that the union's negotiating committee was clearly informed of the layoffs the day they occurred. Moreover, after receiving that notice, the union not only failed to request bargaining over the layoffs at subsequent negotiating sessions, but also proposed a management-rights provision that permitted the employer to institute layoffs without consulting the union. The employer submitted a counterproposal which included a tentative acceptance of the union's proposal. Under these circumstances, the Board concluded that the union "expressly signaled its willingness to permit [unilateral layoffs] in the future." *Id.* at 4.

In the present case, the Union sent no such express signal by its conduct. The Union proposed no contract language comparable to the union's proposal in *American Diamond* that would suggest any willingness to allow Porta–King to institute unilateral layoffs. Moreover, in *American Diamond,* the union had been notified of the illegal layoffs prior to the parties' bargaining session where they considered the union's contract proposal permitting unilateral layoffs. In sharp contrast the Union in the present case did not actually learn of the layoffs until August 1991. Therefore, Porta–King's reliance on the Union's inaction at the July 1991 bargaining session, where the parties negotiated a contract containing Porta–King's proposed management-rights clause allowing for unilateral layoffs, is not comparable to the facts of *American Diamond.* At the time the July 1991 bargaining session occurred, only rumors of layoffs existed. Other than Orick's layoff, the Union did not learn about Porta–King's unilateral layoffs until August 1991. Porta–King's contention that its waiver argument is further supported by the Union's failure to discuss the layoffs at the September and November 1991 bargaining sessions also fails. The Board observed that the Union, after learning of the layoffs, submitted a written request to Porta–King on August 14, 1991 asking for information relating to the layoffs and employment status of all bargaining unit employees. Porta–King responded to this request in September. Upon learning that four employees in addition to Orick had been laid off, the Union amended its unfair labor practice charge to name these other employees. These actions belie any claim that the Union's conduct expressed a willingness to permit the unilateral layoffs.

We agree with the Board that the Union did not waive its right to bargain over the layoffs. After reviewing the evidence in the record, we hold that Porta–King has failed to make a clear and unmistakable showing that the Union waived its right to bargain over the layoffs. [*See Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983).]

 Porta–King also claims that Shulte's letter to the Union, dated August 29, 1991, stating that Porta–King was willing to meet and discuss the layoffs with the Union, constituted a good-faith offer to bargain with the Union and operated to toll Porta–King's backpay liability. We agree with the Board that the August 29, 1991 offer did not toll backpay liability. As the Board observed, Porta–King's "offer to bargain about the layoffs after they occurred [was] insufficient to 'undo the effects of the [the violation] of the Act.'" *Porta–King Building Systems,* slip op. at 3 (quoting *NLRB v. Seven–Up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953)). An employer's offer to bargain *after* unlawful, unilateral layoffs have occurred, and *after* an unfair labor practice charge has been filed, does not satisfy its duty to bargain in good faith. *NLRB v. Plymouth Stamping Div., Eltec Corp.,* 870 F.2d 1112, 1117 (6th Cir.1989). If Porta–King were allowed to unilaterally alter material terms and conditions of employment and offer to bargain afterwards, "[t]his power would subvert the bargaining process *ab initio.*" *Id.*

Accordingly, we deny the petition for review and enforce the order of the Board.