RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0214P (6th Cir.)
File Name: 02a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

FiveCAP, Inc.,

                _Petitioner/_
        _Cross-Respondent_
          _(00-2162/2398),_

             _v._

National Labor Relations
Board,

           _Respondent/_
        _Cross-Petitioner_
     _(00-2390; 01-1058)._

        Nos. 00-2162/
        2390/2398;
        01-1058

On Petitions for Review and Cross-Application for
Enforcement of Orders
of the National Labor Relations Board.
Nos. 7-CA-37182; 7-CA-39503.

Argued: April 24, 2002

Decided and Filed: June 28, 2002

Before: MARTIN, Chief Circuit Judge; COLE, Circuit
Judge; SHARP, District Judge.[*]

_____

[*]The Honorable G. Kendall Sharp, United States District Judge for
the Middle District of Florida, sitting by designation.

---

## COUNSEL

**ARGUED:** Richard D. McNulty, COHL, STOKER & TOSKEY, Lansing, Michigan, for Petitioner. Jill Griffin, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., Deirdre Fitzpatrick, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent. **ON BRIEF:** Richard D. McNulty, COHL, STOKER & TOSKEY, Lansing, Michigan, for Petitioner. Jill Griffin, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., Deirdre Fitzpatrick, Aileen A. Armstrong, Charles P. Donnelly, Jr., NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., Meredith L. Jason, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. This case involves events arising out of a union organizing campaign by the General Teamsters, Local No. 406 ("the Union"), at FiveCAP, Inc. ("FiveCAP"), a non-profit corporation. The National Labor Relations Board ("NLRB" or "the Board") petitions for enforcement of two orders against FiveCAP. First, the NLRB seeks enforcement of an August 25, 2000 Decision and Order finding that FiveCAP engaged in anti-union activity in violation of Sections 8(a)(1), 8(a)(3), 8(a)(4), and 8(a)(5) of the National Labor Relations Act ("NLRA" or "the Act," which correspond to Sections 158(a)(1), 158(a)(3), 158(a)(4), and 158(a)(5) of Title 29 of the United States Code). Second, the NLRB seeks enforcement of an October 31, 2000 Decision and Order finding that FiveCAP committed further violations under Sections 8(a)(1), 8(a)(3), 8(a)(4), and 8(a)(5)

conclusion that FiveCAP has violated this section by failing to bargain with the Union prior to instituting these changes.

### III.    Uncontested Violations

FiveCAP does not appeal nor challenge the Board's conclusions regarding a number of violations of Sections 8(a)(1), 8(a)(3), and 8(a)(4). Therefore, FiveCAP has essentially "admitted the truth of those findings." *NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 232 (6th Cir. 2000) (quoting *NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1241 (6th Cir. 1996)). This court is obliged to summarily enforce the Board's order as to those findings. *See Gen. Fabrications Corp.*, 222 F.3d at 232; *NLRB v. Autodie Int'l, Inc.*, 169 F.3d 378, 381 (6th Cir. 1999).

### Conclusion

For the aforementioned reasons, we **ENFORCE** the Board's orders, except as to its determination of the layoff of Art Burkel from August 3 until August 17.

Under a *First Nat'l* analysis, argues FiveCAP, it was not required to bargain over the elimination of either of these positions.

We find this argument to be without merit and agree with the NLRB that the elimination of these positions constitutes a failure to bargain under Section 8(a)(5). While FiveCAP rightly points out that decisions only peripheral to the terms and conditions of employment are not encompassed by Section 8(a)(5), *see, e.g., NLRB v. Plymouth Stamping Div., Eltec Corp.,* 870 F.2d 1112, 1115 (6th Cir. 1989), the line that is to be drawn between "conditions of employment" and fundamental business changes is a fairly bold one. In general, "[a] guideline to follow . . . is whether requiring bargaining over this sort of decision will advance the neutral purposes of the Act, namely promotion of labor-management relations and the collective-bargaining process without unduly burdening management's right freely to choose the basic direction of a corporate enterprise." *Id.* at 1115 (quoting *First Nat'l,* 452 U.S. at 681 and *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 223 (1964) (Stewart, J., concurring)). Deferring to the Board's factual finding that the changes made by FiveCAP were not fundamental operational changes, we find that these changes did not alter the direction or scope of FiveCAP's "business" as required under *First Nat'l*. Indeed, the decision to purchase a common computer network, while perhaps causing changes to aspects of FiveCAP's infrastructure, cannot be considered to alter the services and capabilities of FiveCAP from a business perspective. Similarly, the decision to consolidate three Head Start classrooms into two likewise does not effect the type of alteration required by *First Nat'l*. Indeed, nothing in the record suggests that these changes were related to a partial shut down of FiveCAP's operations or some fundamental change in the services that FiveCAP offers. Because these changes are not of the magnitude eviscerated in *First Nat'l*, and instead are wholly related to the terms and conditions of Union employees, the changes are well within the scope of Section 8(a)(5). We thus find no error in the Board's

of the Act while labor proceedings were pending against FiveCAP. For the following reasons, this Court **ENFORCES** both orders, except as to the temporary layoff of Art Burkel.

### Factual Background

*FiveCAP*

FiveCAP is a non-profit corporation that administers general welfare programs in four impoverished counties in Michigan. In particular, FiveCAP maintains an energy assistance program, also called a "weatherization" program, Head Start educational assistance programs, housing programs, and meal assistance programs. Mary Trucks ("Trucks") serves as FiveCAP's executive director and works in FiveCAP's principal office in Scottsville, Michigan. In the past, Trucks has openly opposed the organization of FiveCAP employees by unions.

FiveCAP receives federal funding from the Community Services Block Grant Act ("CSBG"). *See* 42 U.S.C. §§ 9901-26. Pursuant to the CSBG and analogous Michigan law[1], FiveCAP is required to maintain a tripartite board of directors: one-third of its members are elected public officials or their representatives; one-third are selected from the private sector; and one-third are "persons chosen in accordance with democratic selection procedures adequate to assure that [they] are representative of low income individuals and families in the neighborhood served." 42 U.S.C. § 9910. As to this third

---

[1] *See* Mich. Comp. Laws § 400.1111(1) ("One-third of the members shall be low income, elderly, or consumers with disabilities residing in the service area of the community action agency. One-third of the members shall be representatives of the units of local government and public agencies within the service area of the community action agency. One-third of the members shall represent the private sector, including representatives of business and industry, agriculture, labor, and religious and civic organizations located within the service area of the community action agency.")

category of members, any member of the community can be considered for the board by submitting a petition with the signatures of twenty low-income residents. In practice, however, Trucks often hand-picked individuals to serve on the board and asked FiveCAP employees to obtain the necessary signatures from FiveCAP clients.

*The Union's Campaign*

In the fall of 1994, the Union initiated an organizational campaign among FiveCAP employees. On December 22, 1994, Marv Holland, a business representative at the Union, wrote a letter to Trucks notifying her of the Union's intention to "organize most FiveCAP employees." On January 20, 1995, the Union filed a petition seeking to represent FiveCAP employees. In furtherance of this petition, the Union held a representation hearing on February 10, 13, and 14. Dale Smith, Tom Belongia, David Monton, Verna Fugere, Bruce Kent, Melissa Kukla, and Amanda Lange were asked by the Union to attend the hearing and potentially testify. Smith, Belongia, Monton, Fugere, and Kukla, among other FiveCAP employees, actually testified at the hearing.

On March 31, 1995, the Regional Director of the Union issued a Decision and Direction of Election ("Decision"), stating that, with the exception of FiveCAP coordinators and supervisors, all other categories of positions would be included in the bargaining unit. The Decision also stated that a Union election would be held on April 28, 1995. At that election, the majority of FiveCAP employees voted in favor of representation by the Union. The Union was certified as the representative for FiveCAP on May 8, 1995.

*After the Union Campaign*

The NLRB concluded that during this period of time, Trucks openly expressed disdain towards Union representation of FiveCAP employees and outwardly threatened retaliation for those "untrustworthy" employees that became involved in Union activities. Trucks had told

until fifteen minutes after their last drop-off. FiveCAP did not notify the Union that it was instituting any of these policies, nor did it offer the Union the opportunity to discuss these policies, outside of the uncompleted bargaining negotiations.

The Board did not err in concluding that FiveCAP's failure to discuss these policies with the Union constitutes a failure to bargain under Section 8(a)(5). The terms of payment for Head Start bus drivers clearly fall within the scope of 8(a)(5), and FiveCAP's decision to bypass the Union and institute a compensation scheme without completing negotiations constitutes substantial evidence of a failure to bargain.

*B.    Head Start Classroom Consolidation and the Elimination of the Data Entry Position*

As stated above, in February 1998, FiveCAP, without consulting the Union, decided to consolidate the Head Start classrooms at the Fountain Center, thus eliminating the position of one Head Start teacher. During this same period of time, after purchasing a common computer network for all FiveCAP centers, FiveCAP eliminated the position of data entry clerk. Prior to the installment of the common network, the data entry clerk was responsible for entering information from the various FiveCAP centers onto a centralized computer.

The General Counsel alleges that FiveCAP's failure to bargain over the elimination of these two positions clearly amounts to a failure to bargain under Section 8(a)(5). On appeal, FiveCAP vehemently disagrees, stating that these changes were part and parcel to fundamental economic changes at FiveCAP. In the case of the consolidation of the Head Start classrooms, FiveCAP argues that this change was a financial necessity due to low enrollment. As to the elimination of the data entry position, FiveCAP insists that this change was necessary due to a fundamental change in the way in which data was entered into the FiveCAP computers.

However, the NLRA mandates that employers are required to bargain *only* over matters concerning "wages, hours, and other terms and conditions of employment." 29 U.S.C. §158(a)(5). The Supreme Court has held that an employer has no duty to bargain over matters relating to fundamental changes in the business enterprise. *First Nat'l. Maint. Corp. v. NLRB*, 452 U.S. 666, 676 (1991) ("[In enacting 8(a)(5)] Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed."). The *First National* Court held that courts must make a distinction between those changes that relate simply to the employer-employee relationship and those managerial decisions that relate to the fundamental alteration of a profitable business. Employers are only required to bargain over matters pertaining to the former category of changes. Thus, where an employer makes a fundamental business change based solely on economic reasons, that employer is not required to bargain over the terms of these changes.

The General Counsel alleges that FiveCAP failed to bargain over three changes in the terms and conditions of employment of three classes of employees: Head Start bus drivers, a data entry position, and Head Start teachers at the Fountain Center.

### A.    *The Compensation of Head Start Bus Drivers*

On October 4, in the midst of uncompleted bargaining negotiations with the Union over the compensation policies for bus drivers, FiveCAP unilaterally notified bus drivers that they would no longer be able to drive their buses to their homes at night; instead, all buses would be parked at a centralized location at which bus drivers would meet every day. Under this new policy, drivers would be compensated from the time they left the centralized location until they returned. On October 9, FiveCAP modified this policy such that drivers could choose between two policies: this new policy and the former policy, under which drivers were compensated from fifteen minutes before their first pick up

---

various FiveCAP employees that "if the Union was voted in, she would just fire everybody, she had done it once, and she can do it again." Trucks also stated that those employees that testifed at the representation hearing could "kiss their jobs goodbye." Trucks stated that certain employees who testified at the representation hearings, namely Smith and Belongia, could no longer be trusted because of their involvement in the Union.

In making these findings, the NLRB concluded that despite official statements by FiveCAP that employees supporting the Union would not be treated differently, Trucks's threats constituted interference with the right to organize, as proscribed by Section 8(a)(1) of the NLRA.[2] FiveCAP does not challenge that conclusion here.

Trucks's open disdain towards the organization of FiveCAP employees was only the first of several charges filed against FiveCAP for unfair labor practices. The facts relevant to each alleged violation of the Act are recounted in detail below.[3] In general, the first Complaint Order filed by the General Counsel ("FiveCAP I") alleges that ten FiveCAP employees were unlawfully discharged, laid off without recall, or reprimanded based upon their involvement in the Union in

---

[2]"It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title" 29 U.S.C. § 158(a)(1).

[3]The claims alleged in FiveCAP I are discussed in sections I(A), I(B), I(C), I(D), and II(A) *infra*. The claims alleged in FiveCAP II are discussed in sections I(E) and II(B) *infra*.

violation of Sections 8(a)(1), 8(a)(3)[4], 8(a)(4).[5]  The Complaint further alleges that FiveCAP failed to bargain with the Union regarding compensation terms for bus drivers under 8(a)(5).[6]  In addition, a second Complaint Order filed by the General Counsel (FiveCAP II) alleges that while the proceedings against FiveCAP before the NLRB were taking place, FiveCAP constructively discharged one employee who testified against FiveCAP in violation of Sections 8(a)(3) and (4). The General Counsel also alleges that FiveCAP failed to bargain with the Union over the elimination of two employee positions in violation of Section 8(a)(5).

## Procedural Background

### FiveCAP I

After investigating the charges filed against FiveCAP, the NLRB's General Counsel issued a Complaint Order alleging that FiveCAP violated the NLRA by unlawfully discharging, laying off, and failing to recall ten Union supporters and bypassing the Union by negotiating directly with employees. The Union presented its case before Administrative Law Judge ("ALJ") Stephen Fish over the course of nine days from January 29, 1996 to February 8, 1996.  On January 31, 1997, the ALJ issued a decision and recommended order concluding that FiveCAP had committed multiple violations of the

---

[4] "It shall be unfair labor practice for an employer . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).

[5] "It shall be unfair labor practice for an employer . . . (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter." 29 U.S.C. § 158(a)(4).

[6] "It shall be unfair labor practice for an employer (5) to refuse to bargain collectively with the representatives of his employees . . . ." 29 U.S.C. § 158(a)(5).

---

longer work under the conditions placed upon her by the Head Start supervisors.  The General Counsel alleges that the previously discussed incidents ultimately created unbearable work conditions, thus causing Kukla's constructive discharge. The Board agreed that FiveCAP facilitated a pattern of harassment and humiliation against Kukla, one that would induce any reasonable person to resign.  Substantial evidence exists to support this finding. It is clear from the record that Kukla was made subject to a repeated series of incidents intended to harass and humiliate her.  Moreover, it is equally clear that these events were a result of Kukla's involvement in the Union, and in particular, her involvement in proceedings regarding pending unfair labor charges against FiveCAP.  Finally, we find it self-evident that any reasonable person subjected to similar conditions-- reprimands for failing to comply with contrived policies, false accusations of theft, and demotion despite extensive experience--would be compelled to resign. This unquestionably satisfies this court's constructive discharge standard under the NLRA.

## II.  Failure to Bargain

Section 8(a)(5) of the NLRA requires that employers notify and bargain with the Union over changes in the terms and conditions of its employees. "[U]nilateral action with respect to any mandatory subject of bargaining is prohibited, for it is a circumvention of the duty to negotiate which frustrates the objective of section 8(a)(5) much as does a flat refusal." *NLRB v. Plainville Ready Mix Concrete Co.*, 44 F.3d 1320, 1325 (6th Cir 1995) (quoting *NLRB v. Katz*, 369 U.S. 736 (1962)).  Failure to bargain with and notify the union regarding such changes minimizes the importance and effectiveness of the employer-union relationship. *Id.* at 1325 ("If an employer changes wages or other terms without affording the Union an opportunity for adequate consultation, it minimizes the influence of organized bargaining and emphasizes to the employees that there is no necessity for a collective bargaining agent." (quoting *May Dep't Stores v. NLRB*, 326 U.S. 376, 385 (1945))).

reassigned as Foley's teaching assistant. Kukla's pay and benefits remained the same.

FiveCAP alleged before the Board that the decision to consolidate the classrooms was made because enrollment at the center was particularly low that year: while the center had received funding for 52 students, only 34 were enrolled. This low number of students did not require three classrooms. When asked why the consolidation took place eleven weeks before the close of the school year, Foley stated that she had continually told the Fountain Center staff that if the enrollment did not increase, people would have to be laid off. However, Foley privately told two volunteers that the decision to consolidate was a matter of "good business judgment" and was not a "matter of money."

Substantial evidence supports the Board's finding that the decision to consolidate the classrooms at the Fountain Center and relinquish Kukla's teaching duties was not supported by any legitimate purpose and was instead motivated by anti-union animus. We find persuasive the fact that the Board found that FiveCAP failed to proffer a credible reason for consolidating the classrooms eleven weeks prior to the close of the school year. Rejecting Foley's explanation that the layoff was necessary due to low enrollment, the Board pointed to the fact that other Head Start centers were lacking in enrollment, yet only the Fountain Center classrooms were consolidated. Moreover, even if this were true, it is unclear why Kukla, who had the most teaching experience, should have been demoted to teaching assistant. Given Kukla's active Union support, and Foley's prior treatment of Kukla, we find that there existed substantial evidence that Kukla was removed from her position as classroom teacher on the basis of anti-union animus.

####    4.   *Constructive Discharge Claim*

Shortly after FiveCAP consolidated the classrooms at the Fountain Center, Kukla resigned, stating that she could no

NLRA. In particular, the ALJ concluded that FiveCAP had, in violation of Sections 8(a)(1), 8(a)(3), and, where applicable, 8(a)(4),[7] of the Act: (1) unlawfully discharged Dale Smith from the weatherization department; (2) unlawfully discharged Tom Belongia from the weatherization department; (3) unlawfully failed to recall Art Burkel and David Monton from the weatherization department; (4) unlawfully discharged community support worker Verna Fugere; (5) unlawfully eliminated the Home Start program, and in so doing, unlawfully failed to recall Home Start teachers Melissa Kukla, Amanda Lange, Karen Sandstedt, and Jane Myers; (6) unlawfully reprimanded Bruce Kent for the manner in which he recorded his time; and (7) unlawfully bypassed the Union by negotiating directly with bus drivers about compensation policies. FiveCAP timely filed exceptions to the ALJ's decision. On August 25, 2000, the Board issued a Decision and Order affirming the findings of the ALJ. FiveCAP filed a petition to review the Board's order on October 6, 2000. The Board filed a cross-application for enforcement on November 22, 2000.

###   *Five CAP II*

The NLRB's General Counsel issued a second Complaint Order on January 30, 1998, alleging that FiveCAP had committed further violations of the Act, including the unlawful constructive discharge of Melissa Kukla as well as the failure to bargain with the Union over the elimination of two employee positions. The Union presented its case before ALJ James Rose on various days between May 11 through June 8, 1998. On December 17, 1998, the ALJ issued a decision and recommended order concluding that FiveCAP had: (1) unlawfully harassed and retaliated against Kukla for her participation in Union activities and caused her constructive discharge in violation of Sections 8(a)(1),

---

[7]Smith, Belongia, Monton, Fugere, and Kukla testified at the representation hearing, entitling them to protection under Section 8(a)(4).

8(a)(3), and 8(a)(4); and (2) failed to notify and bargain with the Union regarding the elimination of the data entry position and the consolidation of the Head Start classrooms in violation of Sections 8(a)(1) and 8(a)(5). On October 31, 2000, the Board issued a Decision and Order affirming the findings of the ALJ. FiveCAP filed a petition to review the Board's order on November 28, 2000. The Board filed a cross-application for enforcement on January 5, 2001.[8]

**Standard of Review**

This Court reviews NRLB decisions using three standards of review. First, this Court reviews the Board's factual determinations as well as the Board's application of law to these facts under a substantial evidence standard. *See ITT Auto. v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999). Under this standard, the Board's decisions must only be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "That is, if the record viewed as a whole provides sufficient evidence for a reasonable factfinder to reach the conclusions the Board has reached, the court will not disturb those findings." *Peters v. NLRB*, 153 F.3d 289, 294 (6th Cir. 1998). This Court defers to the Board's reasonable inferences and credibility determinations, even if we would conclude differently under *de novo* review. *See ITT Auto.*, 188 F.3d at 384; *see also NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir. 1998) ("We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony.").

This Circuit also applies two additional standards when reviewing the Board's conclusions of law. Where the Board interprets the NLRA, this Court engages in deferential

---

[8]The Union also alleged a number of events that the Board concluded were not unlawful. Because the parties do not challenge these conclusions, they are not at issue here.

earlier that day and had used several of the carpet samples. This fact seems to indicate that Foley could easily surmise the location of the carpet samples by speaking with Kukla, and that she had no reason to believe that they had been stolen. Furthermore, even though Foley did not directly tell the sheriff's office that she thought that Kukla stole the carpet samples, this was certainly the implication of her telling the sheriff that Kukla was the only person to have been in the building that day. Moreover, the NLRB found incredible White's testimony that FiveCAP policy mandated that they contact the police for any theft. These facts cumulatively constitute substantial evidence that FiveCAP acted unlawfully.

We find no error in the Board's conclusion that Foley's insistence that Kukla leave her door was motivated by anti-union animus. Assigning the requisite deference to the ALJ's credibility determination that Foley was disingenuous in stating that the open-door measure was simply intended to reduce the amount of employee chatter, and considering that the measure was instituted the Monday after Foley called the sheriff and would likely humiliate Kukla, it appears that the Board acted on the basis of substantial evidence in concluding that FiveCAP unlawfully harassed Kukla because of her support for the Union.

### 3.   *Reassigning Kukla to Teaching Assistant*

The Fountain Center is comprised of three classrooms of students, ranging from ages three to four and a half. The children were divided by age into the three classrooms. Kukla, who had the most teaching experience, taught a class of the oldest children; Pam Jolly taught the next oldest children, and Foley taught the youngest children.

Shortly after the theft incident, on February 19, FiveCAP management consolidated the three classrooms at the Fountain Center into two classrooms. As a result, Kukla was relinquished of her duties as a classroom teacher and

Later that afternoon, April Foley, a Head Start supervisor, arrived at the Fountain Center and found that several of the carpet samples were missing. She also noted that Kukla had been at the Fountain Center that day, and noticed that Kukla had used some of the new carpet samples. Foley phoned White, who told Foley to follow company policy and call the sheriff. The sheriff asked Foley whether she saw any signs of forced entry, and if she knew if anyone else had been in the building that day. Foley replied that it looked like Kukla had been in the building. Foley immediately had the locks changed on the building.

The next day, a sheriff's deputy went to Kukla's home to question her about the missing carpet samples. Kukla told the deputy that she had used some of the carpet samples, and that she had placed the remainder in the basement. She offered to show the deputy where she left the samples; however, when they arrived at the Fountain Center, the locks had been changed, and Kukla was unable to enter using her key. On Monday, February 11, the deputy returned to the Fountain Center, concluded that the samples were mostly accounted for, and did not pursue the matter any further. Kukla was not made subject to any formal disciplinary action by FiveCAP.

When Kukla returned to work on Monday, Foley notified Kukla that she must leave her door open at all times when children were not present, so that Foley could "keep an eye on her." Foley testified that this was because the classroom teachers often congregated in Kukla's classroom to chat and would not get their work done. The General Counsel alleged, however, that this measure was meant to humiliate Kukla for the "investigation" of the alleged "theft."

We find that the NLRB correctly concluded that FiveCAP violated the NLRA, both by essentially reporting Kukla to the authorities and by forcing her to leave her classroom open. We agree with the Board that Foley acted with unreasonable haste upon finding the carpet samples missing. Foley testified that she realized that Kukla had been in the Fountain Center

*Chevron* review and reviews all other legal conclusions *de novo*. The Board's interpretations of the NLRA are reviewed according to the two-step process articulated in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), under which the court first must determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress has directly addressed the issue, then the court must give effect to the statutory text. *Id.* at 842-43. If Congress has not spoken directly, this Court must determine whether the Board's interpretation is based on a permissible interpretation of the statute. *Id.* at 843. Under this standard, the Board's reading of the statute need only be reasonable; it need not be the best interpretation. *See Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996) ("For the Board to prevail, it need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one."). Finally, questions of law outside of the NLRA are reviewed *de novo*. *See Meijer, Inc. v. NLRB*, 130 F.3d 1209, 1212 (6th Cir. 1997).

### Jurisdiction

This Court retains jurisdiction to review final orders of the Board pursuant to 29 U.S.C. §§ 160(e) and (f).

In the proceedings below, FiveCAP argued that it was not subject to the jurisdiction of the NLRB because it is a "political subdivision" exempt from the terms of the NLRA. We concur in the NLRB's finding that FiveCAP is in fact an "employer" subject to the jurisdiction of the NLRA and is not a "political subdivision." A political subdivision must be "either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." *NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn.*, 402 U.S. 600, 604-05 (1971) (adopting in part the Board's construction of the statutory term "political subdivision."). An entity can only

satisfy the second prong of *Hawkins County* by ensuring that a majority of its board of directors are directly responsible to the general electorate. *See Econ. Sec. Corp.*, 299 NLRB 562 (1990). Though one-third of FiveCAP's board of directors consist of politically elected individuals and their designees, and another third are selected "in accordance with democratic selection procedures" sufficient to assure that they represent the low-income community that FiveCAP serves, we agree with the Board that this does not mean that FiveCAP's board is administered by individuals who are responsible to the *general* electorate. *See Enrichment Servs. Program, Inc.*, 325 NLRB 818, 819 (1998) ("An 'electorate' of all poor persons or groups thereof does not include all individuals in the area served who would be eligible to vote in general political elections. Accordingly, we find that the Employer's directors who are 'elected by the poor' are not 'responsible . . . to the general electorate' within the meaning of the *Hawkins County* test."). Because this portion of FiveCAP's board of directors cannot be considered responsible to the general electorate, FiveCAP cannot be considered a political subdivision.

## Discussion

I. The Discharge, Constructive Discharge, Lay Off, Failure to Recall, and Reprimand of Ten FiveCAP Employees

In determining whether an employer has unlawfully terminated or laid off an employee on the basis of anti-union animus, this Court applies the test enunciated in *Wright Line v. NLRB*, 251 NLRB 1083 (1980). *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983) (adopting the *Wright Line* test). Under *Wright Line*, the NLRB's General Counsel must establish a prima facie case of discrimination by setting forth evidence that supports an inference that the employee's protected activities were a motivating factor in the employer's decision. In particular, the General Counsel must demonstrate that (1) the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity; and (3) that the employer acted as it did on

### 1. Enforcing Unreasonable Preconditions to Taking Time Off

FiveCAP's leave policy requires that an employee provide a doctor's note after an absence of three consecutive days. Kukla was subpoenaed to testify before the NLRB regarding FiveCAP's labor practices on October 15. The following day, she called in sick due to back pains. When she returned to work, White refused to allow Kukla to work without first producing a copy of the NLRB subpoena as well as a doctor's note, notwithstanding FiveCAP's written policy. When Kukla finally produced these documents, White issued a reprimand to Kukla for her failure to provide them timely.

We conclude that the Board did not err in finding that White's treatment of Kukla amounted to a violation of Sections 8(a)(3) and 8(a)(4). This seemingly arbitrary "subpoena rule" was not present in any of FiveCAP's employee manuals, and FiveCAP policy regarding doctor's notes did not require Kukla to provide a written doctor's note for being absent for just one day. We also place weight upon the fact that the subpoena in question sought Kukla's testimony regarding FiveCAP's unfair labor practices. Finally, we note that the Board rejected as incredible White's contention that she was acting pursuant to company policy. The Board's conclusion is supported by substantial evidence, and thus must be enforced by this court.

### 2. Accusing Kukla of Theft

On Friday, February 6, the Fountain Center received a donation of 95 carpet samples. On Saturday, while in the Fountain Center preparing for classes, Kukla and her teaching assistant discovered the carpet samples and took several to her classroom to replace the old carpet. They placed the old samples in the basement, along with the remaining new samples.

### E.   The Constructive Discharge of Melissa Kukla

An employee can bring a claim for constructive discharge based upon anti-union animus under Section 8(a)(3), and, where applicable, 8(a)(4), of the NLRA where she can demonstrate that her employer "makes working conditions so unbearable because of the employee's Union activity or demotes an employee because of Union activity and the employee is thus induced or forced to resign." *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 459 (6th Cir. 1967). In determining whether work conditions are "unbearable," this Court applies an objective standard, under which the conditions must be so undesirable that a reasonable person in the same situation would choose to resign. *See Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510 (6th Cir. 1991) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir.1987)).

While the labor charges against FiveCAP were pending, Melissa Kukla sought a preliminary injunction ordering FiveCAP to reinstate her to a vacant teaching position. FiveCAP ultimately complied, assigning her to a classroom position at FiveCAP's Fountain Child Development Center ("Fountain Center"). Once Kukla was reinstated, the General Counsel alleges that she was made subject to several humiliating and harassing incidents as a result of her support for the Union and participation in proceedings brought against FiveCAP. The General Counsel argued, and the Board agreed, that each of these incidents violates Sections 8(a)(3) and 8(a)(4), and that the cumulation of these events ultimately caused her constructive discharge. We now consider these incidents, both to the extent that they violate the Act in and of themselves, and to the extent they contribute to a showing of constructive discharge.

the basis of anti-union animus. *NLRB. v. Gen. Fabrications Corp.*, 222 F.3d 218, 226 (6th Cir. 2000) (quoting *ITT Auto. v. NLRB*, 188 F.3d 375, 388 (6th Cir.1999)). As to this third prong, we have held that evidence of an employer's anti-union animus can be purely circumstantial, and that many factors can contribute to a finding of an anti-union motive, including

the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge.

*W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995). Once the General Counsel has made out a prima facie case of anti-union animus, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have taken the same action even in the absence of protected conduct." *NLRB v. Gen. Sec. Servs. Corp.*, 162 F.3d 437, 442 (6th Cir. 1998).

### A.   The Discharge of Employees in the Weatherization Department

FiveCAP's weatherization initiative assists low-income residents in minimizing energy costs by inspecting homes and installing energy-saving apparatus. At the time that the Union was conducting its organizational campaign, the weatherization department consisted of five employees: Paula Clark, the director; Tom Belongia, the field supervisor; Dale Smith, the inspector; David Monton, crew leader; and Art Burkel, laborer.

### 1.   The Layoff and Subsequent Discharge of Dale Smith

On April 28, 1995, the same day of the Union election, Paula Clark resigned, effective immediately. At that time, both Belongia and Burkel were away on sick leave. That same evening, Dale Smith, who was an observer at the Union election, received a phone call from Russell Pomeroy, FiveCAP's fiscal officer. Pomeroy told Smith that because Clark had resigned and Belongia and Burkel were on sick leave, Smith would be temporarily laid off. Smith also received a letter to this effect, dated April 28, indicating that with three out of five employees absent, Smith would be laid off for two weeks or less. Clark testified before the ALJ, however, that upon her resignation she left three weeks worth of scheduled work for both the inspectors and laborers. Smith also testified that he could have performed Belongia's tasks while he was on sick leave. Smith told Pomeroy over the phone that he wished to complete one such outstanding project in order to get paid. After speaking with Trucks, Pomeroy permitted Smith to come in to complete this project.

Smith returned to work on May 4 to complete his outstanding project. While he was working on the project, he received a phone call from a woman named Sandra Fraley. Fraley was a friend of Darlene Pietz, a client of FiveCAP. Fraley asked Smith when he would be able to assist Pietz with her weatherization projects. Smith explained to Fraley that he was temporarily laid off and did not know when Pietz's project could be completed. He suggested that Fraley or Pietz call the local FiveCAP contact person or speak with Trucks directly.

Later that day, Trucks received a phone call from Lutheran Social Services, indicating that they had received a complaint from Fraley about the timeliness of the weatherization department's work on Pietz's mobile home. Trucks testified that in speaking with Lutheran Social Services, she realized that Smith had violated FiveCAP's confidentiality policy by discussing the business of a client with a non-client. That

### D.   The Reprimand of Bruce Kent

FiveCAP policy provides that bus drivers are to be compensated from the time they pick up their first child of the day. Bus drivers are not paid for their driving time to and from their first pick up and last drop off. As a matter of practice, however, bus drivers who ride the so-called "Irons route," which includes a thirty-mile distance to the first pick-up, are permitted to charge for the drive from their homes to the home of the first child. This unwritten exception was enforced under Diane Smolinski, a bus driver supervisor.

Kent is employed at FiveCAP as a Head Start bus driver. Kent was an active supporter of the Union and testified at the representation hearing. In September 1995, Kent began driving the Irons route four times a week. After submitting his time sheets, White asked him why he was charging for time prior to when the first child was picked up. Kent explained the unwritten "Irons route" exception that he had always followed under Smolinski. He invited White to speak to Smolinski, who had since left FiveCAP. White called Smolinski, who confirmed that this was the standard practice. Nonetheless, White issued Kent a written reprimand for overcharging his time. White instructed Kent to charge his time pursuant to the written policy.

Substantial evidence supports the NLRB's conclusion that the reprimand of Kent was likely the result of anti-union animus rather than any legitimate employee policy. In doing so, we point to the finding by the ALJ that notwithstanding her discussion with Smolinski, White issued the reprimand to Kent without first issuing a warning or a notice of change in policy. Moreover, we find reasonable the Board's conclusion that FiveCAP did not proffer a credible legitimate reason for the reprimand. Given this set of facts, the Board did not err in determining that FiveCAP had violated Sections 8(a)(1) and (3) of the Act by issuing the reprimand.

January 1996, FiveCAP advertised for a number of teaching and teacher's aide positions through their Head Start program at the various centers. Kukla, Lange, Sandstedt, and Myers each applied for numerous of these positions and were neither interviewed nor hired for any of these positions.

We agree with the NLRB's finding that FiveCAP's failure to recall Kukla, Lange, Sandstedt, and Meyers to either the Home Start program or some analogous position was unlawful. FiveCap challenges the Board's conclusion, and in particular, the ALJ's factual finding that the new welfare laws were not a legitimate reason for eliminating the Home Start program. The testimony of the Home Start teachers as to their perceived ability to accommodate families despite the changes in welfare law, argues FiveCAP, is insufficient to support a finding that FiveCAP's reasons were pretextual. However, the Board did not find FiveCAP's actions to be unlawful on the basis of the Home Start teachers' ability to adjust to the welfare law changes. Rather, the Board found two factors to be relevant: first, that Trucks continued to change her testimony as to the reasons for eliminating the program; and second, that Trucks failed to even consider any of the home-visit teachers for other positions after the Home Start program was eliminated. The deference given to the ALJ's credibility findings and other factual findings suggests that substantial evidence exists to support the Board's determination that FiveCAP's failure to recall the home-visit teachers was not the simple result of changed welfare policies, but in fact a deliberate tactic to keep Union supporters from returning to FiveCAP. We thus must enforce the Board's finding as to this claim.

afternoon, Trucks called Smith into her office and angrily reprimanded Smith for violating FiveCAP's confidentiality policy. Smith asked Trucks if she was going to fire him. Trucks ultimately responded, "you are going to be fired, but not right now." Smith and Trucks continued to angrily exchange words, and Smith continued to ask if he was fired. Trucks ordered Smith to leave the building; when he refused, Trucks ordered her secretary to call the police. Smith then left, telling Trucks that he would be in touch with her in the form of a lawsuit.

That same day, Trucks sent Smith a letter indicating that he had been terminated because of his behavior in their meeting. She testified that she did not have any intention of discharging Smith when she called him into her office, but his conduct during their meeting was inappropriate and merited termination.

Mindful of the factors relevant to a finding of anti-union animus, we find that substantial evidence exists to support the Board's determination that the layoff and subsequent firing of Smith was unlawful. Smith was known by Trucks to be an avid supporter of the Union: he testified at the representation hearing and also observed the Union election that took place the same day he was laid off. The Board appropriately found suspicious the haste with which Smith was laid off, particularly given the backlog of weatherization projects left by Clark upon her departure. Moreover, the severity of Trucks's punishment of Smith, first by laying him off and next by terminating him, relative to the insignificance of his acts also contributes to a finding that Trucks was acting out of anti-union animus. Indeed, the Board found incredible Trucks's justification for the termination of Smith. Finally, the fact that all of these events transpired within days of the union election certainly supports the Board's finding of unfair labor practices. *See Adair Standish Corp. v. NLRB,* 912 F.2d 854, 861 (6th Cir. 1990) ("More importantly, Adair's decision to post the tardiness policy (along with the union authorization revocation notice) immediately after the union

election belies the company's assertion that the posted policy was nothing more than a formal statement of existing protocol."). The NLRB concluded on the basis of substantial evidence that Trucks acted based upon her disdain for the Union rather than any legitimate employer-related reason.

### 2.   *The Discharge of Tom Belongia*

In May, Belongia, an active Union supporter, returned to FiveCAP after a period of sick leave. Shortly thereafter, several FiveCAP employees, including Paula Clark, initiated a petition drive seeking the removal of Trucks and Pomeroy for "improper management, unfair labor practices, and breach of fiduciary duties." At the end of May, Trucks and Pomeroy realized that such a petition was being circulated and immediately began interviewing employees about their knowledge and involvement in the petition. On May 31, Trucks called Belongia into her office to ask him if he had any knowledge of the petition. Belongia reluctantly admitted to having seen the petition, but refused to say anything further about it. Trucks told Belongia that in the future it was important that he tell her of anything he knew about the petition. Belongia told Trucks that if he knew of someone trying to harm FiveCAP, he would bring it to her attention, but that the petition was simply supporting the Union, and he would not report others' involvement in it. Trucks said that if Belongia truly felt that way, it might be "a good time for him to go." Belongia told Trucks that he was looking for another job, and he might have another job in a month. Trucks told Belongia that he could stay on at FiveCAP for thirty days, during which he could find another job, on the condition that he share any information he discovered regarding the petition. If he failed to comply with this condition, Trucks told him, "I can assure you, your ass is grass. And I'm warning you, I will not tolerate it." On June 2, Trucks sent Belongia a memorandum summarizing their meeting, including the fact that Belongia agreed to leave in thirty days, on the condition that he report to her anything he heard about petitions against management.

year. As a result, the four teachers were not recalled to their positions as Home Start teachers.

Trucks testified that she did not apply for Home Start funding because of changes in Michigan welfare laws that mandated that welfare recipients, including those with small children, work twenty hours per week as a condition of receiving welfare benefits. Because the Home Start program required parents to be home when the home-visit teacher is present, scheduling around work obligations became too tedious and thus the program was canceled. Trucks also testified that she did not apply for funding because the Home Start program was not well received by the parents.

The Home Start teachers tell a different story, however. Sandra Rotzein, the Home Start supervisor, testified before the ALJ that parents were pleased with the Home Start programs in Manistee and Lake Counties. Rotzein also testified that while pre-enrollment was down from prior years, there were still a relatively significant number of children enrolled and parents interested in keeping their children in the program. Furthermore, all four teachers testified that the new welfare laws would not be prohibitive of running the Home Start program; the teachers were all willing to work around parents' schedules so as to accommodate their jobs and their need for educational assistance. The General Counsel alleged that Trucks's failure to apply for further Home Start funding thus was a ploy to eliminate avid Union supporters; indeed, Trucks once stated during the union campaign that "she was not going to fight for funding for jobs of people that she couldn't trust."

Upon finding that they were not to be recalled for the upcoming school year, all four teachers separately inquired about alternative teaching positions that they could fill. Melba White, the supervisor in charge of Head Start, notified each teacher that there were no available jobs for them in any of the Head Start facilities, other than positions for which they were unqualified. However, between August 1995 and

Willis was his protected activity of circulating the petition [for increased vacation time].").

We find no error in the Board's conclusion that the discharge of Fugere was wholly unlawful. It is readily apparent that the petition was related to the working conditions at FiveCAP. By its very terms, the petition sought the removal of Trucks and Pomeroy for their failure to manage FiveCAP properly. Moreover, local press coverage of the petition drive reflected both Concerned Citizens' and Trucks's understanding that the petition drive was related to the Union and alleged unfair labor practices at FiveCAP. That the petition explicitly and implicitly regarded management-employee relationships, and that Trucks understood it to be so, is representative of substantial evidence that Fugere was engaging in protected activity and thus was unlawfully terminated in violation of Sections 8(a)(1) and (3).

C. *The Elimination of the Home Start Program and the Failure to Recall Melissa Kukla, Amanda Lange, Karen Sandstedt, and Jane Meyers*

FiveCAP maintains a federally-funded Head Start program, a child development program that operates in eight centers in FiveCAP's four county area. As part of this program, FiveCAP also maintains a Home Start program, through which home-visit teachers travel to the homes of preschool children and their parents on a weekly basis to provide educational support. The Home Start program runs during the course of a regular school year; at the close of the school year, home-visit teachers are laid off until the beginning of the next school year.

Kukla, Lange, Sandstedt, and Myers, active Union supporters, were all Home Start teachers for the 1994-95 school year in Manistee County and Lake County and, as usual, laid off at the end of the school year. That summer, Trucks did not apply for funding for the Home Start programs in Manistee County and Lake County for the 1995-96 school

On June 7, Trucks called Belongia into her office to request a report that she had assigned to him on the day before. Belongia replied that he had understood that the report was due the next day, that the report was only partially completed, and that he needed to leave at 5:30 that day for personal reasons. Trucks told Belongia that if he did not complete the report that day, he should not come back to work.

Belongia ignored Trucks's statement and returned to work the next day. Upon his arrival, Trucks stopped him from signing in and told him to leave. The two then began to argue. Belongia told Trucks that if he was fired, he wanted her to put it in writing. Trucks told Belongia that he would receive something in the mail, but he should leave immediately. Belongia refused to leave, stating that he wished to retrieve his personal belongings. Trucks told her secretary to call the police and told Belongia not to retrieve his belongings. When the police officer arrived, Trucks told him that she had asked Belongia to leave five times, and he had refused to do so. Belongia explained that he was an employee, and Trucks responded, "Not anymore." The police officer asked Belongia to leave, and he complied. The next day, Trucks sent a letter to Belongia indicating that he had been terminated for his conduct in their meeting on June 8, namely his use of insults and threats of violence.

We agree with the Board that there exists substantial evidence that the discharge of Belongia was unlawful. As an initial matter, we agree with the Board's finding that Trucks suggested that Belongia resign because of his support of the Union and, by extension, his unwillingness to report to Trucks the activities of fellow Union supporters. Furthermore, we assign the requisite deference to the Board's finding that Trucks was disingenuous when she insisted that she had no intention of terminating Belongia until he acted as he did in their June 8 meeting. Given Trucks's haste in firing Belongia and her hostile behavior towards him in their meeting, as well as her concession that Belongia's skills were very much needed in the weatherization department, the Board's

conclusion is sound.  Indeed, it appears that the heated exchange between Trucks and Belongia was an extension of the larger conflict between the two, namely that Belongia was unwilling to help her sabotage activity among FiveCAP Union supporters.  That Trucks clearly acted on the basis of anti-union animus is more than supported by substantial evidence.

### 3.   *The Layoffs of David Monton and Art Burkel*

#### i. *The Layoff of Burkel from August 3 until August 17*

After both Smith and Belongia were terminated, Monton and Burkel continued to perform their work in the weatherization department as crew leader and laborer, respectively. In mid-July, 1995, Monton suffered a non-work related injury, causing him to take sick leave.  As the sole member of the weatherization department, Burkel continued to work on several projects by himself, though sometimes Pomeroy would assist him.  On August 3, Burkel was notified that because Monton was on sick leave, it would be unsafe for him to complete projects on his own.  Burkel was then laid off, from August 3 until August 17, when Monton returned from sick leave.

The Board conducted a two-step analysis in determining that the layoff of Burkel from August 3 through 17 was unlawful. First, the NLRB concluded that FiveCAP carried its burden under *Wright Line* in demonstrating that there was a legitimate reason for laying off Burkel from August 3 through August 17, namely that it would be unsafe for Burkel to complete projects by himself. However, the NLRB concluded that because the unlawful discharge of Smith and Belongia were the proximate cause of the absence of employees available to accompany Burkel, his layoff was also unlawful.[9]

---

[9]Member Brame dissented from this portion of the Board's decision.

Trucks is anti-union. Once Trucks became aware of the petition, she called Fugere into her office to meet with herself and Pomeroy; Trucks told Fugere that she would be tape-recording their conversation. Trucks told Fugere that she had breached FiveCAP's anti-solicitation policy and advised her to hire an attorney.

The next day, when Fugere arrived at work, Pomeroy handed Fugere a typed transcript of her conversation with Trucks and asked Fugere to sign it. Fugere refused to sign the document, stating that she would first like to consult an attorney. Trucks told Fugere that she was fired; when Fugere asked for a reason, Trucks told her to read the transcript of their conversation.  A few days later, Fugere received a letter from Trucks, indicating that Fugere had been terminated for gross insubordination, arising out of Fugere's actions regarding the petition.

Section 7 of the NLRA grants employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection."  An employer violates Sections 8(a)(1) and (3) of the Act wherever it hinders or interferes with an employee's participation in activities encompassed by Section 7.  As a rule of thumb, protected activity must regard "employees' relations with their employer and thus constitute a manifestation of a 'labor dispute.'" *NLRB v. Leslie Metal Arts Co., Inc.*, 509 F.2d 811, 813 (6th Cir. 1975).  Where employee activity involves the circulation of a petition, that petition must regard in some way the conditions of employment -- otherwise it is not considered protected activity.  *Id.  See also Joanna Cotton Mills Co. v. NLRB*, 176 F.2d 749 (4th Cir. 1949) (circulation of a petition by an employee for the removal of a foreman for personal reasons is not protected activity). However, where the petition seeks the amelioration of work-related conditions, the circulation of a petition is considered protected activity.  *See NLRB. v. Pyromatics, Inc.,* 677 F.2d 24, 26 (6th Cir. 1982) ("There is substantial evidence to support a finding that the principal reason or dominant motive for the discharge of

As to the tolling of the backpay order, we are likewise bound to the Board's finding that the backpay order was merely an attempt to save face days before the hearing. Thus, we join in the Board's finding that the backpay order was not tolled as of January 26, 1996.

### B. The Discharge of Community Support Worker Verna Fugere

Upon her departure as weatherization director, Clark, along with a number of other former employees, dissatisfied with the state of affairs at FiveCAP, formed a group called "Concerned Citizens for a Better FiveCAP" ("Concerned Citizens"). Notwithstanding FiveCAP's no-solicitation policy, under which employees are prohibited from circulating petitions or any other materials without prior approval from management, Concerned Citizens initiated a petition drive. The drive sought the removal of Trucks and Pomeroy from their respective positions at FiveCAP. Concerned Citizens accused Trucks and Pomeroy of mishandling FiveCAP funds by cutting programs yet according themselves raises; terminating needed employees without replacing them; and using FiveCAP's funds to deter the Union's campaign. The group also began picketing outside of FiveCAP's Scottsville office, garnering attention from the local press. Two articles appeared in the Ludington Daily News on June 1 and 19, 1995, both of which chronicled the activities of Concerned Citizens and the pending unfair labor charges that had been filed by the NRLB against FiveCAP. Trucks was quoted in the article as saying that the activities of Concerned Citizens were mostly a ploy by the Union to elevate its bargaining position. Moreover, she stated that the Union had always intended to remove her from her position at FiveCAP.

In late May, 1995, Clark gave a copy of this petition to Fugere, a community support worker in FiveCAP's Mason office. Fugere in turn circulated the petition to several fellow employees, urging them to support the petition because

The NLRB reasoned that even assuming Burkel was a 'neutral' employee,

> his layoff was the direct result of action that the Respondent clearly took for an unlawful motive. In this regard, Burkel's situation was not unlike that of employees who are discharged or otherwise disciplined as the result of a facially unlawful rule or a rule or change in policy which an employer institutes for unlawful reasons.

The Board reasoned that regardless of whether Burkel himself was a target of anti-union animus, the fact that his layoff was a result of unlawful action makes it likewise unlawful as a sort of "fruit of the poisonous tree."

We find that the latter portion of the Board's analysis lacks substantial factual support and does not satisfy the test in *Wright Line*. Because the Board found that FiveCAP possessed a legitimate reason for laying off Burkel, the burden remains with the General Counsel to demonstrate that FiveCAP nonetheless acted on the basis of anti-union animus. *See Wright Line v. NLRB,* 662 F.2d 899, 906-07 (1st Cir. 1981) (enforcing *Wright Line*, 251 NLRB 1083 (1980)) ("With respect to this ultimate question of a determining causal link between the bad motive and the discharge, the burden of persuasion remains always with the General Counsel."). However, the Board did not require this of the General Counsel; it merely imputed the burden that the General Counsel carried with respect to Smith and Belongia. Once the Board determined that FiveCAP possessed a legitimate reason for laying off Burkel, thus satisfying its burden under *Wright Line*, the General Counsel is required make a particularized showing that FiveCAP nonetheless acted on the basis of anti-union animus. The Board cannot simply infer such animus from separate acts involving other employees, particularly here, where there exists a neutral fact heavily contributing to Burkel's layoff: Monton's absence due to sick leave. The record indicates that Monton and Burkel

regularly completed projects together and continued to do so without the assistance of either Smith or Belongia for six weeks prior to Monton's absence. Moreover, once Monton recovered, both he and Burkel were recalled, albeit temporarily, to work. Therefore, the unlawful discharge of Smith and Belongia, without more, is insufficient to sustain the General Counsel's burden under *Wright Line.* As such, the Board's determination is not supported by substantial evidence and will not be enforced.

### ii. The Layoffs of Burkel and Monton On and After August 17

On August 16, Monton called Pomeroy to tell him that he was ready to return to work; Pomeroy suggested that both Burkel and Monton return the next day. However, when Monton arrived at work on August 17, Pomeroy told him that he could not recommence work. Pomeroy explained that Trucks decided that because they had just appointed a new weatherization director, they wanted the director to have a chance to "get on his feet" before Monton and Burkel could return.

Monton and Burkel ultimately were recalled to work on January 26, 1996, three days before the hearing before the ALJ. Pomeroy explained that while Trucks had hired a new director, James Mason, on August 4, Mason resigned on September 5. Trucks subsequently hired Chad Van Atter to take over as weatherization director on September 28. However, Trucks and Pomeroy did not recall Burkel and Monton until almost four months later.

The Board found incredible Pomeroy's testimony that he and Trucks wanted to wait to recall Monton and Burkel in order to allow Mason, and then Van Atter, time to acclimate to the position of director. Rather, the ALJ found the last-minute decision to be a ploy on the part of Trucks to prolong Burkel's and Monton's layoffs. Moreover, while the ALJ acknowledged that Pomeroy testified that he sent recall letters

to Burkel and Monton on January 26, 1996, the ALJ also found relevant the fact that these letters were sent three days before the hearing. The ALJ concluded that FiveCAP sent the letters at that time "in an attempt to lend some credence to its purported defense that lack of supervision was responsible for the layoff." The NLRB concurred in the ALJ's conclusion that these layoffs were unlawful.

FiveCAP challenges the Board's determination as to the post-August 17 layoffs of Burkel and Monton only as to the period of time from August 17 through September 28, the date on which Trucks hired Van Atter. FiveCAP argues that it demonstrated a legitimate reason for failing to recall Burkel and Monton during this time period, namely that Mason needed time to acclimate to his post, and, after he resigned, the department was in need of yet another director. FiveCAP also argues that any back pay order emanating from its failure to recall Monton and Burkel should be tolled as of January 26, the date on which Monton and Burkel were recalled.

FiveCAP's arguments lack merit. The Board correctly concluded that there was substantial evidence of anti-union animus on the part of FiveCAP, and that the search for a director was pretextual. As stated previously, this Court is required to give substantial deference to credibility determinations by the ALJ, and thus we must credit the ALJ's conclusion that Pomeroy was disingenuous about FiveCAP's reasons for waiting to recall Burkel and Monton. Notwithstanding this finding, however, the record seems to indicate that other motives were at play. In particular, Burkel and Monton had managed without a director for several months, as Clark resigned on April 28. Moreover, both Burkel and Monton testified that there was plenty of backlogged work that the two of them could have done together without the assistance of a director. These facts contribute to a substantial showing of anti-union animus.