NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0666n.06

Nos. 15–1563/15-1607

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Dec 13, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD, | ) ) ) | |
| Petitioner/Cross-Respondent, | ) ) ) | ON APPLICATION FOR ENFORCEMENT AND CROSS PETITION FOR REVIEW OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD |
| v. | ) ) ) | |
| JAG HEALTHCARE, INC., d/b/a GALION POINTE, LLC, | ) ) ) | |
| Respondent/Cross-Petitioner. | ) | |

BEFORE:    COLE, Chief Judge; DAUGHTREY and MOORE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  This labor-management dispute arose as the result of JAG Healthcare's takeover of a small, unionized health care facility, Village Care, which it renamed Galion Pointe.  In what amounted to an overnight coup, JAG fired all the Village Care employees, rehired only some of them, and refused—at least initially—to recognize the existing union.  Following complaints filed by the union and union members, a hearing before an administrative law judge, and an order from the National Labor Relations Board to remedy unfair labor practices by JAG, the company filed this petition for review, contending that there is not substantial evidence in the record to support the findings of the Board, that JAG is not the proper respondent in this case, and that the NLRB erred as a matter of law in finding that certain announcements made by JAG's owner and chief executive officer, Jim Griffiths, constituted illegal coercion rather than statements of fact or mere predictions, the expression of

which is protected by the First Amendment. The Board cross-applies for enforcement of the order and contends that substantial evidence in the record supports its findings. The Board further argues that we lack jurisdiction to consider the question of whether JAG was the proper respondent in the case. For the reasons set out below, we deny the company's petition for review and grant enforcement of the Board's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Respondent JAG Healthcare is a management company that operates skilled nursing homes. Its business model involves identifying small nursing homes that are struggling financially and revamping their operations to make them profitable. JAG manages these nursing facilities and provides staffing for the nursing homes, and JAG oversees and manages the senior staff at its homes.

On July 1, 2010, JAG began operating two Ohio facilities owned by Cardinal Nursing Homes, Heritage Care and Village Care, which had previously been leased by Continuum. These facilities were renamed Shelby Pointe and Galion Pointe, respectively. Pursuant to an Operations Transfer Agreement signed by Village Care and Galion Pointe on June 29, Griffiths and his staff prepared to take over operation effective July 1. As part of that agreement, all Village Care employees were terminated at 11:59 p.m. on June 30, when Village Care ceased operation.

At that time, various employees of Village Care, including nurses' aides, housekeepers, dietary aides, cooks, laundry employees, activity aides, environmental aides, and maintenance helpers, comprised a bargaining unit that was represented by the Service Employees International Union Local 1199 (SEIU). Those employees were notified of the transfer of ownership of the nursing home on June 30, primarily through a notice posted next to the Village

Care time clock by Amanda Ronk, Village Care's director of nursing. The notice invited the employees to meet with the new owners of the nursing home that afternoon.

In the afternoon of June 30, JAG administrators went to Village Care to prepare to take control of operations—including deciding which Village Care employees they wished to rehire. JAG's corporate director of nursing services, Miriam Walters, had primary responsibility for determining which employees to rehire, but Griffiths retained the final say over all hiring decisions. Walters relied heavily on Ronk's input in determining which former Village Care employees to rehire.

When Village Care employee and union delegate Julie Barnhart saw the June 30 notice, she contacted SEIU organizer Dawn Courtright, who came to the facility to speak with Barnhart. When Connie Knight, Village Care's human resources manager, saw Courtright arrive, she notified Griffiths, who approached Courtright and Barnhart and introduced himself. When Courtright asked if Griffiths would recognize the existing union, he said he would not, stating that none of his facilities were unionized and that Village Care also would not be. Griffiths then asked Courtright to leave the premises.

Courtright did not leave, but instead accompanied Barnhart to the scheduled meeting. Before the meeting began, Courtright was asked by Village Care administrator Paul Andrella to go to his office (which she did, along with Barnhart), where Andrella told Courtright that she had to leave the facility because she had not given 24 hours' notice before her visit, as required by the collective bargaining agreement. Courtright responded that she had not been given 30 days' notice that the nursing home was sold, also as required by the agreement. Andrella told Courtright that if she did not leave, he would call the police and have her arrested. Faced with that threat, Courtright left Village Care's property.

During the June 30 meeting with Village Care employees, Griffiths explained JAG policies and terms and conditions of employment that differed from the policies in force at Village Care, including a ban on smoking, new uniforms that would have to be purchased through JAG, the elimination of shift differentials in pay for night or weekend shifts, and the loss of paid time off accrued with Village Care. Griffiths also emphasized that none of JAG's nursing homes were unionized and that, as of the next day, there would be no union at the newly named Galion Pointe. Griffiths also said that employees could unionize later if they wished, but that he did not believe they would need union representation. He then announced that JAG had a non-solicitation policy[1] and asked the nursing staff to call the police in order to remove any union organizers who came to the facility on or after July 1, 2010.

On July 2, 2010, the SEIU held a press conference across the street from Galion Pointe to protest JAG's decision not to rehire several former Village Care bargaining-unit employees. Several former Village Care employees, including Barnhart, attended the press conference.

---

[1] JAG's written non-solicitation policy provided:

> During work time, each associate is to be occupied with his or her assigned responsibilities. Engaging in the distribution of literature during work time or in working areas or soliciting support of other associates for any group, cause or product on work time is prohibited.
>
> Non-associates are prohibited from soliciting or distributing any written or printed materials of any kind for any purpose on Company premises at any time. In addition, it is not permissible to post on the premises or remove from the premises any signs, notices, or printed material. Company bulletin boards are to be used exclusively for materials that have been reviewed and approved for posting by management.
>
> Associates of course are free to discuss anything they wish during breaks or meal periods, providing that all associates involved in the discussion are also on break or meal period. Distribution of literature or materials by associates in non-work related areas, on non-work time is also permissible. However, using any Company equipment or property to do so is not allowed and may be cause for disciplinary action.

Galion Pointe personnel, including Ronk, observed the press conference and noted which former employees were in attendance.

In addition to convening the press conference, union representatives continued to ask JAG to recognize and bargain with the union. After Courtright's verbal request on June 30, she sent Griffiths a letter on July 6 requesting recognition. Also on July 6, SEIU Ohio Healthcare Division Director Frank Hornick filed a petition with the Board and wrote a letter to JAG regarding the petition. JAG apparently did not respond to either of these letters.

Three employment decisions that were made in the aftermath of the change in operations at Village Care/Galion Pointe are specifically at issue in this litigation. First, Traci Atkins, a dietary aide at Village Care and a member of the union, was not selected for rehire on July 1 but was offered a job by Dietary Manager Valerie McKelvey on July 6. Atkins accepted the offer to return to full-time employment effective July 19—the amount of time she needed to give proper notice at the job she had been working in the interim—and also agreed to fill in as needed until that date; she in fact worked a fill-in shift on July 7. Atkins also ordered a new uniform, had her picture taken for an ID badge, and submitted an additional application for employment to replace the one that McKelvey had misplaced. On July 13, despite being scheduled for a fill-in shift on July 14, Atkins was notified by McKelvey that she would no longer be able to come back to work, but said she might be called back after things "calmed down."

Second, Natalie Archer, a nurses' aide and member of the union, was hired on July 1 to work at Galion Pointe. On July 2, Archer observed the union press conference and remarked to another employee that she would rather be outside with her friends than inside Galion Pointe. Later that day, Ronk called Archer to her office and asked her if she had made such a statement, which Archer confirmed. Ronk then counseled Archer for what Ronk described as a negative

attitude and negative body language. On July 8, Archer attended a mandatory staff meeting, at which Ronk noted that Archer again displayed a bad attitude. Later that day, Archer notified Galion Pointe that she would have to miss her shift because her son was sick. A few days later, Ronk called Archer into her office and informed her that her employment had been terminated.

The third employee whose discharge is specifically at issue is Diana Nolen, who also was a nurses' aide and member of the union. On July 12, 2010, Nolen too was called to meet with Ronk. At the meeting, Ronk informed her that she was being fired because a nursing home resident overheard Nolen and another aide discussing the union, which reportedly frightened the resident.

Ultimately, the union's dispute with JAG led to an evidentiary hearing before an administrative law judge who heard testimony from 28 individuals. After considering post-hearing briefing, the ALJ found that JAG had violated three provisions of the National Labor Relations Act, 29 U.S.C. §§ 151–169, by telling employees that there would be no union at Galion Pointe; by disciplining Natalie Archer for talking about the union; by refusing to rehire 21 former Village Care employees; by discharging Archer, Atkins, and Nolen; by refusing to recognize and bargain with the union; and by unilaterally changing terms and conditions of employment. The Board adopted the decision of the ALJ, adopted the ALJ's order, as modified, and now seeks enforcement. JAG seeks to have the order set aside.

## II. DISCUSSION

### A. Standard of Review

A court's review of an NLRB decision "is quite limited." *Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 542 (6th Cir. 2016) (quoting *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 905 (6th Cir. 1997)). We review the Board's factual determinations and application of law

to those facts under a substantial-evidence standard and review the Board's conclusions of law *de novo*, although we will uphold the Board's reasonable interpretation of the NLRA in the absence of Congressional pronouncement to the contrary on the same issue. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . [I]f the record viewed as a whole provides sufficient evidence for a reasonable fact finder to reach the conclusions the Board has reached, the court will not disturb those findings." *Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002) (internal quotation marks omitted). We must review evidence in the record that runs contrary to the Board's decision. *NLRB v. Seawin, Inc.*, (6th Cir. 2001). However, we "may not disturb the Board's reasonable inferences even though we may have reached a different conclusion" if we were reviewing the matter *de novo*. *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 304 (6th Cir. 2012). Review of credibility determinations is more deferential than review of fact-finding, and we will overturn such determinations only "if they overstep the bounds of reason" or "are inherently unreasonable or self-contradictory." *Caterpillar Logistics*, 835 F.3d at 542.

## B. <u>Determination of the Proper Corporate Entity</u>

JAG argues that it is not the proper entity to be held responsible for any potential violations of the NLRA. Instead, it suggests that Galion Pointe, LLC, is liable for any unfair labor practices. In support of this argument, JAG states that the Board failed to prove, and did not find, that JAG and Galion Pointe, LLC, are joint employers. In response, the Board points out that JAG failed to raise this concern adequately before the Board.

We have held that the standard by which to determine when an exception before the Board adequately raises an argument is whether it "apprise[s] the Board of an intention to bring up the question." *Temp-Masters, Inc. v. NLRB*, 460 F.3d 684, 690 (6th Cir. 2006) (internal

quotation marks omitted). Here (as in *Temp-Masters*), JAG's objections "constitute objections to the underlying factual findings that the ALJ made" without reference to the legal point particularly at issue. *Id.* JAG never specifically objected to the fact that it was found to be the proper legal entity and never raised such an argument at any time during the administrative process.

The objections in the record that come closest to bringing this issue before the Board appear to be those in which JAG contested the ALJ's finding that JAG "operates" skilled nursing homes; that JAG "acquires" small nursing homes; and that JAG signed a lease for Galion Pointe. But these objections do not provide notice to the NLRB that JAG would raise an argument about whether it was an appropriate legal entity to be sued in the first instance. In fact, JAG's appearance in this matter and its full, affirmative defense of its actions on the merits belie the claim that it was named improperly as the respondent.

Furthermore, as the Board notes, JAG's objections "offered no argument to the Board that the absence of an actual ownership interest in the nursing home precluded the judge from holding it liable for the unfair labor practices." The same can be said for the objection taken to the finding that JAG was the legal entity that signed the lease and the dispute over whether JAG "operates" nursing home or "manages" them—which JAG admits includes overseeing the senior staff at the nursing home facilities. In any event, JAG did not argue to the Board that it could not be considered the employer of the workers in question or that it did not make the hiring decisions at issue in this case, even referring throughout its objections to "JAG Healthcare employees."

## C. **Unfair Labor Practice Claims**

Employees' rights under the NLRA are guaranteed by Section 7 of the Act, 29 U.S.C. § 157, which reads in pertinent part: "Employees shall have the right to self-organization, to

form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." The Board found that JAG violated Sections 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. § 158(a)(1), (3), and (5), which forbid respectively: employers from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights; discriminating in regard to hiring or tenure, or other terms and conditions of employment, to encourage or discourage membership in any labor organization; and refusing to bargain collectively with representatives of unionized employees.

### *Statements by Jim Griffiths*

Many of the unfair labor practices found by the Board are premised on the finding that comments made by Griffiths regarding the unionization of the staff at Galion Pointe were coercive. JAG asserts, however, that Griffiths's statements were "not coercive, as a matter of law and are protected free speech under the NLRA." JAG describes Griffiths's statements as acceptable expressions of opinion or statements of fact. Our review establishes that the Board's findings to the contrary are supported by substantial evidence.

Without question, an employer is free to communicate with its employees in general terms about unions. *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.3d 1292, 1298 (6th Cir. 1988) (citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969)). However, in order to be protected, those statements must not smack of coercion. *Id.* ("[S]tatements regarding the effects of unionization are not protected by section 8(c)'s free speech clause if their reasonable tendency is coercive in effect." (internal quotation marks omitted)). Sixth Circuit precedent is clear that it is the tendency of a statement to coerce that is relevant, not the intent of the statement's maker. *Id.* at 1298–99. The test for whether an employer has interfered with, restrained, or coerced employees

in the exercise of their Section 7 rights is whether the employer's statements, from the employees' point of view, have a reasonable tendency to coerce. *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005). We generally defer to the Board's judgment and expertise in assessing the coercive impact of an employer's statements. *Id.* at 660.

In this case, the Board's finding that Griffiths asked the nursing staff to call the police in order to remove any union organizers who came to Galion Point is supported by the record. This statement, made at the June 30 meeting with staff, is a key part of the context in which Griffiths's other statements were made. Likewise, the Board's finding that JAG threatened to call the police if Courtright did not leave the Village Care facility prior to the meeting with staff provides helpful context.

The Board found that Griffiths's statements—made prior to JAG's hiring decisions—that there would be no union at Galion Pointe were coercive, noting our holding that "[w]hen an employer tells applicants that [it] will be nonunion before it hires its employees, the employer indicates to the applicants that it intends to discriminate against the [predecessor's] employees to ensure its nonunion status. Thus, such statements are coercive and violate Section 8(a)(1)." *Kessel Food Markets*, 287 NLRB 426, 429 (1987), *enforced*, 868 F.2d 881 (6th Cir. 1989) (internal quotation marks and alteration marks omitted). As the NLRB points out, similar statements also have been found coercive by the Board in the past. *See, e.g.*, *NLRB v. Advanced Stretchforming Int'l., Inc.*, 323 NLRB 529, 530–31 (1997), *enforced*, 208 F.3d 801 (9th Cir. 2000), *amended and superseded on reh'g*, 233 F.3d 1176 (9th Cir. 2002).

JAG attempts to distinguish *Kessel* and its progeny by stating that Griffiths, at the time of his statement, had "objectively verifiable facts indicating that it was unlikely" that a majority of the Village Care bargaining unit would be rehired. JAG argues that Griffiths, based on the

analysis conducted when JAG first considered leasing the two Ohio facilities, knew that "perhaps a third or more" of the positions could be filled by existing employees, but "half or more" would need to be filled by employees already in JAG's employ. JAG points to *P.S. Elliott Services*, 300 NLRB 1161 (1990), as standing for the proposition that statements to prospective employees that a facility would be non-union are not coercive when the statement is "nothing more than a truthful statement based on known objective facts."

JAG is mistaken. The assertion found to be a truthful statement of objective fact in *P.S. Elliott* was that the respondent was "a non-union company." 300 NLRB at 1162. That statement was made to employees who had contacted the respondent asking for jobs after their employment had been terminated by another company, when one of those employees asked whether the respondent had a union. *Id.* The NLRB expressly conditioned its finding that the statement was lawful on the specific circumstances in which it was made, *i.e.*, it "was not accompanied by any threats, interrogations, or other unlawful coercion." *Id.*

The present case is more complex, and readily distinguishable from *P.S. Elliott*. First and foremost, there are instances of other "threats . . . [and] unlawful coercion" in this case, including the threat of calling the police should a union organizer come on the premises. Second, key to the finding in *P.S. Elliott* was the fact that the complaining employees did not constitute an appropriate bargaining unit—they were seven employees, hired from a different company, who became part of the respondent's over-100-member workforce. In this context, the respondent's statement that it was a "non-union company" was *itself* found to be a statement of objective fact. JAG, by contrast, advocates that the statement that Galion Point would be non-union is lawful because it was made in light of *other* allegedly objective facts, and despite the fact that there is no dispute over whether the employees would continue to be an appropriate bargaining unit.

Although employers may make statements and predictions that are based on objectively verifiable facts, JAG's attempt to apply this rule to this case is, in our judgment, misplaced. As the Supreme Court has noted, an employer's prediction about the effects of unionization "must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control . . . . [A]n employer . . . [may not make] threats of economic reprisal to be taken solely on his own volition." *Gissel*, 395 U.S. at 618–19 (internal quotation marks omitted); *see also Dayton Newspapers*, 402 F.3d at 659–60.

JAG's citation to *DTR Industries, Inc. v. NLRB*, 39 F.3d 106 (6th Cir. 1994), further emphasizes the differences between JAG's position and the position of other employers whose statements were found to be lawful. In *DTR I*, the predictions made were about possible lost business in the face of unionization, contained in a letter from the employer's president to its employees shortly before a union election. The letter contained details regarding the employer's business model and the potential consequences of unionization based on regulatory and customer requirements. *Id.* at 109. *DTR I*, like *Gissel*, was a dispute over whether such a prediction about consequences of unionization was protected as based on objective facts, or was coercive. The court in *DTR I* re-stated the principle that "an employer may make a prediction as to the precise effects he believes unionization will have on his company." *Id.* at 114 (internal quotation marks omitted). But the court, in the same breath, emphasized that the predictions must be about consequences beyond the employer's control, and "carefully phrased on the basis of objective fact." *Id.*

As we stated in *DTR*, "there is a distinction between 'threats' motivated by union animus and 'predictions' about the probable economic consequences of unionization." *Id.* at 113. Griffiths's statement did not concern the economic effects of unionization on the company.

Griffiths's statements did not concern whether unionization would drive up costs or potentially cause the loss of customers. Despite JAG's contention that economic factors made it "*very likely* [that it would] hire half or less of its workforce from Village Care," JAG's staffing decisions were within its own control. It was entirely within Griffiths's power to rehire or not rehire the relevant number of unionized employees and to recognize the union as an appropriate bargaining unit. In short, JAG has failed to demonstrate that there were economic factors beyond its control that absolutely determined who would be rehired and that were known by Griffiths at the time of his statements. Indeed, as the NLRB points out, Griffiths made his statements well before hiring decisions were reached, and an employer does not know whether it will have an obligation to recognize and bargain with a union until it has hired its workforce. *See Kessel*, 287 NLRB at 429.

Finally, JAG cites to *NLRB v. General Fabrications Corp.*, 222 F.3d 218 (6th Cir. 2000), to suggest that Griffiths's statements that there would be no union were mere assertions that employees would begin "from scratch," which JAG contends cannot be found coercive in the absence of an indication that a regressive bargaining stance would be taken or that benefits would be lowered to penalize workers for unionization. This argument displays a basic misunderstanding of *General Fabrications*. In that case, we held that "[a]n employer's statement that after unionization bargaining will begin 'from scratch' *can be coercive*, and therefore a violation of § 8(a)(1), *depending on the context of the statement*." *Id.* at 231 (emphasis added). We continued by defining coercive statements as "those which indicate that the employer will adopt a regressive bargaining stance or lowered benefits to penalize workers for unionization, and are viewed in the context of other statements or actions by the employer." *Id.* Hence, even

if the statement had been simply that employees would be starting from scratch, there is no legal barrier to finding such a statement coercive.

Because the Board did not commit *legal* error in this regard, the relevant question on appeal is whether substantial evidence in the record supports the Board's finding Griffiths's statements were, in fact, coercive. We conclude that the Board's finding that Griffiths's statements regarding a union presence at Galion Pointe were coercive is supported by substantial evidence. Even assuming that it was a statement that bargaining would start "from scratch," the context of the statement—notably, during a meeting at which Griffiths also stated that the police should be called if union organizers entered the premises and on the same day that he refused to recognize and bargain with the union—provides additional information to support the finding of a violation of the NLRA.

### Non-Solicitation Rule

The Board found that JAG's written non-solicitation policy was legal. But the Board also found that JAG had unlawfully disciplined employees for discussing the union on company premises. JAG contends that this ruling by the Board was in error, that it did not unlawfully apply its non-solicitation rule, and that the Board offered "absolutely no evidence or testimony to support the allegation that JAG does not or did not intend to uniformly apply its non-solicitation/no-distribution policy."

The fact that a written policy rule is legal does not prohibit a finding that it was applied in a non-legal manner. As the ALJ noted, "Griffiths . . . did not limit himself to reciting the written terms of the no-solicitation policy . . . . [He] referenced the no-solicitation policy and then explicitly encouraged staff to call the police for assistance with enforcing the no-solicitation rule against union organizers." Moreover, it is unnecessary to prove that JAG *intended* to apply its

policy in a discriminatory fashion. As we have held, "The test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir. 2000) (quoting *V&S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999)).

JAG further argues that the Board's findings regarding the non-solicitation policy are in error as a matter of law because an employer is not required to permit non-employee union organizers onto its property. However, the ALJ never said that JAG must permit non-employee union representatives onto the Galion Pointe premises. The Board's finding of an NLRA violation instead was based on the fact that Natalie Archer, an employee, was disciplined for making an offhand comment supportive of the union even though other non-work-related discussions were permitted during work hours. Because of the discipline that Archer received, the Board found that an NLRA violation occurred regardless of whether an official or formal rule prohibiting employees from discussing the union was at issue.

JAG nevertheless claims that the Board's finding that JAG unlawfully applied its non-solicitation policy to Archer by disciplining her was not based on substantial evidence because she was disciplined for insubordination and because her comments and attitude affected patient care. The Board, however, discredited those arguments based on testimony in the record. Because there is sufficient evidence in the record to support the Board's conclusion that JAG's actions constituted an illegal application of its non-solicitation policy, JAG cannot establish legal error in this regard.

**D.  Hiring and Discharge Decisions**

The NLRA deems any adverse employment decision that violates Section 7 of the Act to be an unfair labor practice under 29 U.S.C. § 158(a)(3).  JAG contends, however, that the refusal to rehire a union employee is discriminatory "*if and only if* 'the successor was motivated by an intent to avoid its obligation to bargain with the predecessor's union and refused to hire applicants whom it knew were members of the former bargaining unit with that purpose.'" In point of fact, in this circuit we have adopted as the framework for addressing such claims the burden-shifting test set forth in *Wright Line*, 251 NLRB 1083 (1980), and adopted in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983).  *See FiveCap, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002).  Pursuant to that paradigm, the Board first must make a *prima facie* showing "sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision."  *Wright Line*, 251 NLRB at 1089.  That showing requires evidence that "(1) the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity; and (3) that the employer acted as it did on the basis of anti-union animus."  *FiveCap*, 294 F.3d at 777.  After the establishment of a *prima facie* case, the employer must prove, by a preponderance of the evidence, that it would have taken the same action even absent the protected conduct.  *Id.* at 778.  This test applies to decisions to discharge as well as failures to hire.  *See Wright Line*, 251 NLRB at 1089 ("[W]e shall henceforth employ the following causation test *in all cases alleging violation of Section 8(a)(3) or violations of Section 8(a)(1) turning on employer motivation*." (emphasis added)).

Evidence of an employer's anti-union animus can be purely circumstantial, and many factors can contribute to a finding of anti-union motive, including:

expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge.

*FiveCap*, 294 F.3d at 777 (quoting *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995)).

### ***Refusal to rehire***

Contrary to JAG's contentions, there is sufficient evidence in the record to support a finding that JAG harbored anti-union animus and that the animus was a motivating factor in its hiring decisions.[2] The ALJ highlighted just some of the evidence that supported his decision, including Griffiths's June 30 statements to Courtright and Barnhart and to the employees at the meeting; the roster used by Walters in making initial hiring decisions; Ronk's actions in observing and monitoring the July 2 press conference; Walters's notes regarding "good" employees who had indicated that they did not support the union; and JAG's failure to rehire (otherwise qualified) former Village Care employees to positions that they filled after July 1. The weight given to this evidence and the ALJ's determinations not to credit alternative explanations offered by JAG—including its argument that there were not enough bargaining unit positions to rehire everyone and that it did not rehire many because of shortcomings in personnel files—appears reasonable, and we are not persuaded that it should be overturned.

For example, we reject JAG's contention that the ALJ's finding that Walters's goal was to reach a targeted number of rehires from the bargaining unit sufficient to avoid union recognition was "without evidentiary support *of any kind,* but based totally on inference." The

---

[2] JAG's argument that the hiring of some (or in its words, "a large number") of former bargaining-unit employees with the knowledge of their union membership shows that it had no anti-union animus motivating its hiring decisions is unpersuasive. Regardless of how many union employees were hired, JAG also argues that the number was insufficient to require it to bargain with the union. And, as the NLRB argues, there is no legal requirement that an employer fail to hire *any* former bargaining unit employees in order to support a finding of anti-union animus.

ALJ noted that JAG kept track of the total number of union members that it was identifying for rehire, citing as evidence that Walters noted the number of bargaining unit employees at the bottom of the employee roster she was using and explicitly finding that Walters's alternative explanations and JAG's evidence to the contrary were not creditable. These determinations, in the context of the full record, are certainly within the bounds of reason.

### *Discharge*

The Board affirmed the ALJ's determination that Natalie Archer, Traci Atkins, and Diana Nolen were discharged unlawfully, concluding that JAG's objections to the ALJ's findings were based solely on disagreements with credibility determinations that the ALJ made and the Board adopted. On appeal, the landscape appears essentially the same: JAG continues to put forth reasons for its discharge decisions that were expressly rejected by the ALJ and Board based upon credibility determinations.

As we have made clear, discriminatory motivations in discharge may be inferred from the employer's expressed hostility to unions, knowledge of the employee's support and activity in a union, the timing of the adverse action, disparate treatment of the employees involved in the union activities and other, non-union involved employees who commit similar offenses, and the inability of the employer to produce a satisfactory justification. *See General Fabrications*, 222 F.3d at 226; *W.F. Bolin Co.*, 70 F.3d at 871. As explained below, these factors support the ALJ's and the Board's findings that certain employees were discharged for improper reasons.

JAG continues to argue that **Natalie Archer** was terminated "for negative attitude, apparently in front of patients, insubordination and making negative comments about staff on social media sites," and because she "quickly began telling her co-workers that she hated working for Galion Pointe and that she planned to quit." In support of that contention JAG

emphasizes that one of Archer's co-workers reported to Amanda Ronk that Archer stated, in front of a patient, that she would rather be outside with the union demonstration than inside, that Archer confirmed to Ronk that taking care of patients "was no longer her top priority," and that she walked off the job.

However, the ALJ and the Board agreed that the agency made its required *prima facie* showing of anti-union animus, noting that there was no dispute that Archer was a member of the union, that JAG was aware that Archer engaged in union activities, and that Archer was written up for making union-related statements. The ALJ also noted that the timing of Archer's write-ups and discharge was suspect, given the fact that her discharge occurred within a week of the union's request for an election. The ALJ further noted that the reason given by JAG for questioning Archer's absence on July 8 was false.

In determining that JAG had not established a legitimate defense with respect to Archer's discharge, the ALJ stated:

> As a preliminary matter, none of the records that relate to Archer's discharge state that JAG Healthcare discharged Archer because of poor patient care. To the contrary, when JAG Healthcare provided information about Archer's discharge to the State of Ohio, it cited Ronk's notes, which at most outline a generalized concern about Archer's attitude about working at Galion Pointe. The only time that Ronk expressed concern that Archer's attitude could affect patient care was on July 2, when Ronk speculated that Archer's comment that she would rather be outside with the Union than in the nursing home could cause the patients anxiety. Ronk did not document any actual problems with patient care that arose as a result of Archer's July 2 comment in support of the Union, nor did she document any other instances where Archer's attitude affected her care for patients. Given the lack of any evidence that Archer's care for patients deteriorated, and the lack of any evidence that Ronk relied on such a concern when she discharged Archer, I find that JAG Healthcare's affirmative defense lacks merit.

The ALJ further noted that Ronk's testimony regarding Archer's walking off the job on July 2 was not credible.

JAG's disagreements with the administrative decision regarding Archer's termination is based on a disagreement with the ALJ's credibility determinations and application of established law to the facts of the case. But the ALJ's findings clearly delineate the evidence relied upon, and the ALJ and the Board do not appear to have acted unreasonably in reaching those findings.

Before this court, JAG continues to advance the argument that **Traci Atkins** voluntarily resigned her employment at Galion Pointe to work full-time at another job. JAG is correct that some witnesses testified to this effect before the ALJ but fails to note the ALJ's determination that their explanations were not credible. In fact, the ALJ noted that "Atkins . . . did not act in a manner that would suggest that she decided not to return to Galion Pointe . . . . [She] submitted new paperwork, purchased a new set of scrubs . . . and reported for her July 7 fill-in shift as scheduled." Furthermore, the ALJ explained, the testimony from JAG witnesses that Atkins quit her job at Galion Pointe in favor of other employment was not reliable—no documentation was offered in support of their testimony, neither of the witnesses offered a reliable foundation for their testimony regarding Atkins's lack of availability to work at Galion Pointe, and one witness admitted that her testimony was based on hearsay. Because the Board's findings are supported by the credited evidence in the record, and JAG's theory has been discredited, we decline to overturn this finding

JAG's primary proffered reason for terminating **Diana Nolen** was that Nolen mistreated a patient by ignoring his complaint that he was in pain. JAG also claims that Nolen was insubordinate, and that she was thankful for her termination because it allowed her to take a full-time position elsewhere. The ALJ found that the credibility of Nolen's testimony was not undercut by the fact that she began a new job at Galion Community Hospital on the same day

that she was discharged from Galion Pointe. The ALJ specifically credited Nolen's explanation that she needed to find another job after her termination because she had two children to support.

Additionally, the ALJ noted that Ronk's testimony, which was the primary source of the claim that Nolen was fired because of a patient's complaint of abuse, was not credible. The ALJ also noted that testimony based upon a repeat of that story was not credible because it was based on hearsay information from Ronk. The ALJ further explained:

> I have not credited Ronk's account of the rationale for Nolen's discharge for several reasons. First, Ronk's testimony that she and [another administrator] Andrella jointly decided to terminate Nolen was undermined by the fact that Andrella testified in his pretrial deposition that he did not know who Nolen was, or that she had been terminated. Second, Ronk admitted that she did not follow Galion Pointe's internal procedures for investigating resident complaints. Normally, a complaint of resident abuse at Galion Pointe is investigated by the nursing home social worker or by the nursing home administrator. Ronk admitted, however, that she did not know if any such investigation was completed (beyond her own interview of the resident), and further admitted that she believed and relied on the nursing home resident's complaint without investigating the matter further. Third, there is no evidence that Galion Pointe complied with the State of Ohio's reporting requirements for complaints of nursing home resident abuse, such as immediately filing an initial report about the complaint and incident, and then filing a final report within 5 days. And fourth, despite the serious nature of the alleged complaint of resident abuse, both Ronk and Knight indicated that Ronk said little, if anything, about the complaint of resident abuse during Nolen's termination meeting . . . . Specifically, Ronk testified that upon learning that she was terminated, Nolen smiled, said thank you, and walked out her office without asking about the reason for the termination. Knight also testified that Nolen was happy to be terminated, but when asked about the reasons that were provided to Nolen for her termination, Knight only commented that reasons 'were offered,' without describing the nature of those reasons. All of those deficiencies raise significant questions about the credibility of the purported complaint of resident abuse, and about the credibility of Ronk's testimony that the complaint was the basis for Nolen's discharge.

As the ALJ noted, JAG's failure to take proper action to investigate the patient complaint supports an inference of anti-union animus.

Far from indicating that the ALJ ignored evidence that Nolen was terminated for appropriate reasons, the ALJ's decision evidences that proper attention and care was taken in

determining issues of credibility and what the balance of the evidence established. There is no adequate reason given by JAG as to why we should overlook those findings.

### E. Forfeiture of Rights

In a final issue on appeal, JAG argues that it maintained its right to establish new terms and conditions of employment because it did not engage in discriminatory employment practices and because it did not rehire a majority of relevant employees from the Village Care bargaining unit. But given our determination that the Board was correct in concluding that JAG engaged in discriminatory hiring practices, we need not address the dispute as to whether a majority of the relevant employees were, in fact, rehired.

### III. CONCLUSION

For the reasons set out above, we conclude that the findings of the administrative law judge, as adopted by the Board, are supported by substantial evidence in the record and that the Board did not commit errors of law as the employer claimed. We therefore GRANT the Board's application for enforcement and DENY the petition for review filed by JAG Healthcare.